64 So.2d 536 (1953)
BOYNTON et al.
v.
STATE.
Supreme Court of Florida, en Banc.
April 7, 1953.
*539 R.L. Williams of Fishback, Williams & Smith, Orlando, and Garland W. Spencer, Sanford, for appellants.
Richard W. Ervin, Atty. Gen., and William A. O'Bryan, Asst. Atty. Gen., for appellee.
MATHEWS, Justice.
This case grows out of a raid conducted by Chief Law Enforcement Officer Bowen of the Beverage Department and a large number of supervisors, together with the sheriff and some deputies from Orange County, on what is known as the Flamingo Club in Orange County, Florida.
The Attorney General spotlights the general circumstances under which the raid occurred which gave rise to the prosecution of the appellants; for in his main brief filed before this Court, it is stated:
"Beverage officers Whidden and Bowen and Sheriff Starr entered the front door of the building which opened into a small bar. Apparently without *540 stopping or encountering anyone, they passed from this small bar into a rather large dining and dancing room, crossed this room and entered into what was known as the gambling room, toward the back of the building. The record is devoid of any suggestion that they made any inspection or search of the premises for any violations of the Beverage Act from the moment they entered the building until they arrived at the so-called gambling room." (Emphasis supplied.)
After the raid, arrests, searches and seizures, the sheriff made affidavits upon which warrants were issued for the arrest of each of the appellants. In due course information was filed against all of the appellants in four counts.
(1) The appellants, Andrew W. Boynton and Ralph Strawder, and Bessie McKinney were charged with the offense of maintaining a gambling room, (2) the appellants, Andrew W. Boynton, Ralph Strawder, Charles D. Cotton, John C. Franklin, D.C. Broadnax and Josephine Wright, and Bessie McKinney were charged with the offense of conducting a lottery, (3) the appellants, Andrew W. Boynton, Ralph Strawder, Charles D. Cotton, John C. Franklin, D.C. Broadnax and Josephine Wright, and Bessie McKinney were charged with the offense of possession of implements and devices for conducting a lottery, and (4) the appellants, Andrew W. Boynton, Ralph Strawder, Charles D. Cotton, John C. Franklin, D.C. Broadnax and Josephine Wright, and Bessie McKinney were charged with the offense of possession of lottery tickets representing an interest in a lottery for money.
Bessie McKinney was found not guilty of the charges against her.
John C. Franklin was found guilty on the second count of conducting a lottery, guilty of the third count of possession of implements and devices for conducting a lottery, and guilty on the fourth count of having in his possession lottery tickets representing an interest in a lottery for money. Charles D. Cotton was found guilty on the second, third and fourth counts of the offenses of conducting a lottery, possession of implements and devices for conducting a lottery, and having in his possession lottery tickets representing an interest in a lottery for money. D.C. Broadnax was found guilty under the second count only of conducting a lottery. Josephine Wright was found guilty under the second, third and fourth counts as above set forth.
Prior to the date of trial, the appellants, Andrew W. Boynton and Ralph Strawder, filed a motion to suppress the evidence, which among other grounds, contained the following:
"1. That the business operated by Flamingo Club was leased to Defendants on and prior to September 22, 1951, and was not open for business on the 22nd day of September, A.D. 1951, and the only part of said building open for business was a small bar open to the public, and that said small bar open to the public was far distant from the back room searched by the Beverage Inspectors and Agents and by the Sheriff and Deputy Sheriffs of Orange County, Florida.
"2. That the only door open for business in the building searched by said officers was the door leading into the small bar far distant from the room searched by said officers.
"3. That the room searched by the said officers could only be entered from an outside entrance door far distant from the bar in said building which was open for business, and said room was not on the 22nd day of September, A.D. 1951, used for the transaction of business with the public generally, and never had at any time prior to the 22nd day of September, A.D. 1951, ever been used for the transaction of business with the public generally.
"4. That no liquors or intoxicating beverages were stored in said room searched by said officers, and no permit for storage of liquors therein had ever been granted by the State Beverage Department of the State of Florida, *541 nor had any application ever been made to the State Beverage Department for the storage therein.
"5. That said room was forcibly entered by the officers of the State Beverage Department and the Sheriff and Deputy Sheriffs of Orange County, Florida, without any right in law so to do, and without the benefit of first securing a warrant of arrest of any person in said room or any person in said building, and without first securing a good and sufficient search warrant for the purpose of searching said room or said building."
The appellants, Charles D. Cotton, John C. Franklin, D.C. Broadnax and Josephine Wright, also filed a motion to suppress the evidence on the grounds that:
"1. That none of the defendants are in any wise connected with the ownership, management or operation of Flamingo Club, and that the person and effects of the defendants were unlawfully and illegally searched by said officers and said defendants were required by said officers to surrender up and deliver possession of articles allegedly possessed by them without the benefit of a search warrant and at a time when said defendants were peaceably going about their business and not engaged in the commission of any crime known to the laws of the State of Florida, in the presence of said officers, nor did said officers have a lawful warrant for the arrest of any of said defendants.
"2. That at the time of said illegal and unlawful search defendants had each been placed under arrest by the State Beverage Agents of the State of Florida, without any authority in law in that these defendants had committed no crime known to the laws of the State of Florida, in the presence of said officers or in the presence of any other officer, and said arrest, without a warrant of arrest, was made on suspicion only and was illegal and unlawful in its inception, and the search of the person and affects of these defendants made thereafter was illegal and void and violated the constitutional rights of these defendants guaranteed to them by Section 22 of the Declaration of Rights to the Constitution of the State of Florida [F.S.A.] and by the 4th Amendment of the Constitution of the United States."
The motions to suppress the evidence were denied. Pleas of not guilty were filed and the trial proceeded which resulted in convictions as above set forth. Judgments and sentences were entered.
In due course motion for new trial was filed as to all appellants, which was denied. The appellee, before the Bar of the Court and in its brief, stated:
"There was no search warrant issued for the premises and the officers were proceeding under the statutory authority provided by Section 561.07, Florida Statutes [F.S.A.], which defines the powers and duties of supervisiors of the Beverage Department, and Section 562.03, Florida Statutes [F.S.A.], which provides that the places of business of licensees shall always be subject to inspection and search during business hours by Beverage Department supervisors and also by sheriffs, deupty sheriffs and police officers."
Although appellee states the proceedings were under the statutory authority of Section 561.07, F.S.A. and Section 562.03, F.S.A., other sections of the Beverage Law must be construed in connection with the sections above mentioned.
Section 561.07, F.S.A. gives the supervisors access to and the right to inspect the premises of all licensees to collect taxes and to examine the books and records of all licensees. It makes it the duty of the supervisors to require strict compliance with the laws relating to "the transaction of such business."
Section 561.29, F.S.A. makes the maintenance of a nuisance or unsanitary premises or permitting disorderly conduct "on the premises where such beverage business *542 is conducted" a reason to revoke or suspend the license of any licensee.
Section 562.03, F.S.A. makes it mandatory that the licensee by the acceptance of the license to agree that his place of business "during business hours" shall always be subject to be inspected and searched without search warrant by the supervisors and also by sheriffs, etc. This section prohibits any beverage, except for personal consumption, to be kept by the vendor in any building or room other than the building or room "mentioned in his license". The section further provides that where the vendor requires an "additional building or storeroom" for the storing of a portion of his stock, he shall make application to the director for a permit to store such beverages in some other designated building or room. It then provides that such places (meaning "additional building or storeroom" mentioned above) may be inspected and searched at any time by the supervisor, deputy sheriff, or other police officer.
Section 823.05, F.S.A. makes the maintenance of a gambling establishment a nuisance.
A diagram of the place where the raid was conducted including approximately 15 different rooms was filed in evidence by the State. This diagram contains numerous markings, dimensions, names of rooms, etc. It is assumed that this building is all under one roof. It is located at the north-west corner of Elwell Street and Cheney Highway.
Beginning at the Northwest corner there is a "storeroom," then a room designated "Little Bar" with a door opening on Cheney Highway. Back of the Little Bar there is a "soft drink bottle storeroom" and a "Men's Room". A door opens at the back of the "soft drink bottle storeroom" to the grounds around the building. This back door is labeled "Entrance to rear of Little Bar for colored people". Proceeding East from the Little Bar there is another room with a door opening from the Little Bar into such room designated "Part Used with Little Bar." To the rear of this room there is a "dressing room for actors".
To the East of this room there is a room 59 feet 4 inches by approximately 45 feet, which is designated "Dining Room and Dance Floor". In the Southwest corner of this room is a small room designated "storage", then in the back part of the dining room and dance floor there is a place designated "orchestra stand", and to the rear of that is a "storage room" with a small "Restroom" in one corner. Other rooms designated "Ladies' Room," "Men's Room," lead from the dining room and dance floor at the Southwest corner To the East of the orchestra stand there is a space designated "hall" and to the East of that is the room designated "Dressing Room  Shows" and another small room designated "office". Immediately to the rear of the last mentioned hall, dressing room for shows and office, there is a room 26 feet 6 inches by 24 feet 4 inches designated "back room". To the East of the back room and the office there is a hall which has no doors entering into the "Back Room". To the rear of this hall the diagram shows what is apparently a back porch. From the dining room and dance floor there is a door entering into this hall which leads to the porch at the rear and there is a door from the hall to this porch. After going through these two doors onto the back porch there is a door entering the "Back Room". This is the only door entering the "Back Room" and is the door which was entered by the officers. From the dining room and dance floor it is necessary to go through three doors in order to get into the "Back Room". The diagram shows all of the doors closed. To the East of the dining room and dance floor and the other rooms above described, there is a large room designated "kitchen", with a door to the grounds marked "Kitchen door locked." Another room designated "pantry" is in the Southwest corner of the kitchen. To the rear of the pantry there is a small room designated "Men's Room."
The only room in this building, if it is all one building, open for business was the "Little Bar". The undisputed testimony was that there were some workers around the place during the day cleaning up, waxing *543 floors, and making preparation to open the "Nite Club" which includes the dining room and dance floor and the kitchen, for business the following Wednesday. A reproduction of the diagram filed in evidence by the State is repeated here.

*544 It is the contention of the appellants that Section 561.07, F.S.A. and Section 562.03, F.S.A. are illegal and void as violating Section 22 of the Declaration of Rights of the State of Florida and the Fourth Amendment to the Constitution of the United States, and if not illegal and void on their face, that they are in violation of the above sections of the Constitutions of the State and of the United States as construed by the State and attempted to be enforced by the State in this proceeding.
The appellee denies that the acts in question violate the Constitutions of the State of Florida and of the United States as claimed by the appellants, and urges that under the above mentioned statutes of the Beverage Law (providing that the licensee by the acceptance of the license agrees that "his place of business during business hours" shall always be subject to be inspected and searched without a search warrant); first, the back room above described was a part of the licensed place of; second, the beverage officers not only had the right to search the place of business but also the person of all of those congregated in the place of business, including the back room hereinabove described.
The Fourth Amendment to the Constitution of the United States is not applicable in this case. This is a state proceeding and not a proceeding by the Government of the United States or any of its officers or agents. Wherever the Fourth Amendment to the United States Constitution is referred to in this opinion it is because of the fact that it was adopted prior to Section 22 of the Declaration of Rights of the State Constitution and is a part of the history of the guarantees imbedded in the State Constitution for the protection of the rights of the people. The Fourth Amendment to the United States Constitution is a limitation upon the powers of the Federal Government and not on the powers of the states or their officers or agents.
Section 22 of the Declaration of Rights of the State of Florida, which was adopted after the Fourth Amendment of the Constitution of the United States, is almost in identical language to the Fourth Amendment, and is as follows:
"The right of the people to be secure in their persons, houses, papers and effects against unreasonable seizures and searches, shall not be violated and no warrants issued, but upon probable cause, supported by oath or affirmation, particularly describing the place or places to be searched and the person or persons, and thing or things to be seized."
As previously noted, the Attorney General in his brief makes the following general statement in respect to the facts of the case:
"Beverage officers Whidden and Bowen and Sheriff Starr entered the front door of the building which opened into a small bar. Apparently without stopping or encountering anyone, they passed from this small bar into a rather large dining and dancing room, crossed this room and entered into what was known as the gambling room, toward the back of the building. The record is devoid of any suggestion that they made any inspection or search of the premises for any violations of the Beverage Act from the moment they entered the building until they arrived at the so-called gambling room." (Emphasis supplied.)
We agree with the Attorney General's statement, so far as it goes, but we also find from the undisputed evidence that the officers not only entered the bar, but also went from the bar to a cocktail lounge; thence into a large dance hall or dining room; from there into a hall where there was a door; thence through the door-opening down the hall to another door; through this door-opening to an outside porch at least 150 feet removed from the door of the little bar through which they had made their initial entrance into the building. They travelled this path without stopping or encountering anyone or making any inspection or search, or making any effort at an inspection or search for any violation of the Beverage Law. When they reached the door which entered from the outside porch of the building into the back room, called by the Attorney General the "gambling room," they saw nothing and could see nothing because the door was shut. They did not know what was in the room or what was going on in the room. Moreover, it was necessary to use physical force and *545 push the door open in order to get into the back room.
In the appellee's brief it is also stated:
"As soon as he entered the room, supervisor Whidden announced his presence and his official capacity and told all the occupants to just `sit tight'. When he got close enough to the table to identify the bolita tickets, run-down or check lists and the money on top of the table as lottery paraphernalia, he placed everyone under arrest." (Emphasis supplied.)
So it is that the above statement made by the Attorney General is borne out by the record but it is plain that it does not go far enough. The record also shows the testimony as to what was said by Officer Whidden. On cross-examination he was asked if he had testified before the Justice of the Peace on November 9th, and he answered that he did, and at that time (on November 9th) he was asked the following questions and gave the following answers:
"Q. When you walked into the room what did you say to Mr. Strawder? A. I told him I was from the State Beverage Department, and you are under arrest. And sit tight. And then I moved up, trying to hold them there until assistance came."
It further appears that Whidden testified that he pushed open the outside door entering into the back room. The door was shut and he pushed it open. He then testified that he did not know whether the door opened toward the inside or toward the outside. To say the least, according to his testimony, he could not get into the room until he used sufficient force to push the door open. He further testified that Mr. Strawder and Mrs. McKinney were sitting at a table when he pushed the door open. They were between 20 and 25 feet from the door and while standing in the door, after he had pushed it open, he could see something but did not know what it was. He couldn't read anything from that distance. He testified that there was no way in the world that he could read anything on the desk when he entered. After opening the door, according to his testimony, it was necessary for him to go two or three feet into the room before he could see what was on the table. After he got into the room and took sufficient steps to enable him to identify what was on the table, he saw what appeared to be bolita tickets, run-down or check lists and money on the table.
The defendant, Boynton, was not present when the officers arrived and made their raid and conducted this search. According to some witnesses, he appeared 15 to 20 or 25 minutes after the officers. According to the Sheriff, he appeared between 30 to 40 minutes after the officers. Joe Bowen testified that he heard Boynton tell Sheriff Starr that he was manager of the "establishment". This conversation took place in the passage from the dining room going to the back door leading onto the porch. Sheriff Starr testified that Boynton told him he was "manager of the club". No witness testified that he saw Boynton violate any law and he was not searched.
There is a vast difference between a night club business, which the very name indicates is a business conducted at night-time, and the operation of a liquor bar. In the motion to suppress the evidence Boynton and Strawder alleged that the Flamingo Club (Night) was leased to them prior to September 22, 1951, and was not open for business at the time of the raid and that the small bar which was located in the same building as the night club was the only place open to the public for business. There is no contradiction or traverse of this allegation. As a matter of fact all of the testimony offered by the State corroborates the allegations contained in the motion of Boynton and Strawder to suppress the evidence.
The defendants, Franklin and Broadnax, were searched by Beverage Supervisor Whidden who ordered them to empty their pockets on the pool table which was in the room. It is necessary that we consider what happened before this search.
Broadnax and Franklin were not in the room when Bowen, Whidden and the Sheriff entered. The officers who testified as to Broadnax and Franklin testified that they did not see either of them commit any *546 crime. Broadnax was called as a witness and after his testimony was given it was not contradicted nor disputed by anyone. (This testimony seems to be typical as to what happened with reference to the other defendants, Wright and Cotton.) Broadnax worked at the Orlando Air Force Base across the highway from the Flamingo Club. He took a taxi to go to work; he had the taxi park at the rear, where colored people go in to buy drinks. The taxi-driver was Franklin; they parked in a place marked "parking area," which is in a small citrus grove. There was a back door to a room connected with the Little Bar. He testified that when he started over there, "Mr. Strickland hailed me. I didn't know * * * I is kind of stubborn, I guess, what was going on, and I thought it was a stickup or something, and he said, `Come back here,' and after I looked and seen he had a gun, I come, and he said `Get in this door here.'" Then Mr. Strickland told another agent, "Get that other one out of the cab over there." Strickland made Broadnax and Franklin go into the room and made them "shell" out their pockets on the table. Mr. Strickland then searched him and felt all over him. He had not started to the door into the back room but had started to the door entering a room going into the bar to get a "half a pint."
The appellant, Franklin, took the stand and after his testimony, the State offered nothing in contradiction. He testified that he drove Broadnax to the Air Base, and that Broadnax then had him drive to the club to get a drink. He corroborates the testimony of Broadnax, and then testified that Strickland told another agent, "Get that one too and bring him on too." They then rushed him in the back door and said, "Get in there," and after he got in, he was told, "Empty out your pockets."
The procedure with reference to Wright and Cotton was very similar to the procedure with reference to Broadnax and Franklin except that Bessie Wright was seen approaching the place with a handbag in her hand while the officer peeped through a crack. According to the testimony of the officer, she was committing no crime in the presence of any officer but she was searched and arrested the same as the others. Her handbag and purse were seized.
As to the appellant, Cotton, one of the Beverage inspectors testified that Bowen and Whidden directed him to go to the front door and he saw a car approaching and a man got out and entered the building through the Bar. This officer followed him to the middle of the dining room where men were waxing the floors; he testified that he went up to Cotton and told him he would take a bag of tickets and that Cotton seemed confused; he then told Cotton that he was an officer and that he was under arrest for "suspicion of having tickets" and then Whidden came up and took the sack from Cotton. The only thing he saw Cotton do was get out of his car and walk into the building. He did not see him commit a nuisance or violate any law. He chased him around the dance floor and caught him and took the bag out of Cotton's hand but that Cotton did not authorize him to take the bag. He placed Cotton under arrest before he took the bag but had seen him do nothing. He further testified that he did not see the appellant, Wright, do anything before he took her bag. He did not know what was in her bag until he looked in it.
In construing a statute where it is claimed that the same is void because it conflicts with some provision of the Constitution, there are certain cardinal principles: (1) the burden is upon him who assails the constitutional validity of a statute, (2) it is presumed that the Legislature intended a valid constitutional enactment, and (3) when the constitutionality of a statute is assailed, if the statute be reasonably susceptible of two interpretations, by one of which it would be unconstitutional and the other it would be valid, it is the duty of the Court to adopt that construction which will save the statute from constitutional infirmity.
All sections of the statute, including Section 561.07, F.S.A., vesting powers and authority in the Beverage inspectors and others to inspect and search any place without a search warrant springs from Section 562.03, F.S.A., which reads as follows:
"Licensees, by the acceptance of their license, agree that their places of *547 business during business hours shall always be subject to be inspected and searched without search warrant by the supervisors and also by sheriffs, deputy sheriffs and police officers. No beverage defined hereunder, except for the personal consumption of the vendor, his family and guests, shall be kept by a vendor in any building or room other than the building or room mentioned in his license; provided, however, that where a vendor requires an additional building or storeroom for the storing of a portion of his stock of such beverages he shall make application to the director for a permit to store such beverages in some other designated building or room. If such application shall be deemed reasonable by the director he shall without any fee or other charge issue such permit and the vendor will thereby be permitted to keep such beverages in the place designated in said permit and such places may be inspected and searched at any time by any supervisor, sheriff, deputy sheriff or police officer. Such permit shall be issued in duplicate, one copy shall be posted in a conspicuous place in the place of business mentioned in the vendor's license, the other duplicate shall be posted on the outside of the entrance door to the building or room described in the permit." (Emphasis supplied.)
The decided weight of authority is to the effect that the Legislature may impose reasonable conditions as a prerequisite to the issuance of a license to engage in a business which is a privilege. There is no vested right to engage in the business of selling intoxicating beverages. This is a privilege which the State grants upon certain conditions. Section 562.03, F.S.A. requires and makes mandatory that the licensee, by the acceptance of a license, agree that "his place of business during business hours shall be subject to be inspected and searched without search warrant" by the supervisors and also by sheriffs, deputy sheriffs and police officers. The words "place of business" have a definite meaning. If a building has many stores in it which are under the same roof, it means the store or a room where the business is conducted but does not include every store or room in the same building or under the same roof unconnected with the business where the liquor business is conducted. In the brief filed by the appellee the restricted meaning of the "place of business" is admitted. It is asserted by the appellee:
"The licensed premises include not only the rooms where liquors are stored or sold by the licensee, but also all other rooms in the building which are so closely connected therewith as to admit of free passage from the drink parlor to the other rooms, provided that the licensee has some dominion or control over, or the right to use, such other rooms." (Emphasis supplied.)
The back room in this case is not so closely connected with the "place of business" as to admit of free passage from the drink parlor to the other room. The license was not issued in the name of any of the appellants and the record fails to show that "the licensee has some dominion or control over, or right to use" the back room. On the other hand, it affirmatively appears that the night club which included the dining room and dance floor, the kitchen and the back room had been leased to the appellants Boynton and Strawder and was not under the dominion or control of the licensee of the liquor business.
Practically every large hotel in the State of Florida is all under one roof. The stores of the building on the ground floor are valuable stores and they are generally rented to various concerns for different types of business. Although one of the stores may be rented to a licensed liquor dealer and a liquor business may be conducted in such store, this would not give the right to the Beverage inspectors to search every other store under the same roof or in the same building which may have been rented or leased for other purposes. We find these store rooms on the ground floor rented for such businesses as florist shops, barber shops, display rooms and various types of business. The agreement by the licensee that his place of business during business *548 hours shall always be subject to be inspected and searched without a search warrant does not include any other rooms or stores not connected with the liquor business and where the licensee has no dominion or control over the same.
When Section 561.07, F.S.A. provides that the inspectors shall have access to and the right to inspect the premises of all liquor licensees, the "premises" therein mentioned, means the "place of business" mentioned in Section 562.03, F.S.A. The word "premises" cannot and does not enlarge the words "place of business". "Place of business" does include rooms for the storage of alcoholic beverages under a permit as provided for in Section 562.03, F.S.A.
A person operating a restaurant, a dancing exhibition, a beauty parlor, a barber shop, or a flower shop, is required to take out a license for such place of business. Unless such places of business are connected with a licensed liquor store, or are operated in connection with such licensed liquor store or unless the licensee has some dominion or control over these other businesses, they do not constitute a part of the place of business or a part of the premises of the licensee of a liquor store.
The search of the back room so far as Strawder and Boynton were concerned was in plain violation of Section 22 of the Declaration of Rights in that: (a) it was no part of the place of business of the licensee of the liquor store, (b) it was not opened or searched with the consent, approval or acquiescence of either of the said two defendants, (c) the search and seizure was accomplished by breaking and entering into the place without a search warrant or other lawful authority, (d) the officers in question had no knowledge that any crime was being committed in the back room, (e) even after the breaking and entering by pushing the door open, the officer did not see any crime being committed by Strawder and testified that he could not see until he stepped far enough into the room to see gambling paraphernalia on a table, and (f) there was no lawful arrest and, therefore, no lawful search and seizure incident to and in connection with a lawful arrest.
The appellee contends that pushing the door open did not constitute an unlawful entry or trespass. In the case of May v. State, 40 Fla. 426, 24 So. 498, this Court held that pushing open a door which was entirely closed was a sufficient breaking to sustain a conviction on a charge of breaking and entering.
Under the undisputed facts and circumstances in this case, pushing the door open was a sufficient breaking and entering to make the acts of the officers a plain violation of Section 22 of the Declaration of Rights of the Constitution of the State of Florida.
All of the evidence seized by the officers due to this unlawful search and seizure was illegal evidence as to Strawder and Boynton and the motion to suppress the same should have been granted and when the same was offered in evidence at the time of the trial as to Strawder and Boynton, over their objections, such objections should have been sustained.
The defendants, Cotton, Franklin, Broadnax and Wright, are in a different position from the defendants, Strawder and Boynton. There was no testimony of any kind showing that they had any dominion or control over or any connection with the back room. They were not even in the back room at the time of the illegal entry of the officers into such room or when the search of the back room and the person of Strawder took place. Every officer who testified as to them stated that they did not see any one of them committing any crime prior to arrest or search. They were referred to by some of the witnesses as patrons of the place. As testified to by one of the witnesses for the State who was a Beverage inspector, they went on the theory that these people were patrons of the Bar or customers and that they had the right and authority under the Beverage Law, not only to search the place of business of the licensee, but also to search the person of every individual in the place of business or in any room used in connection with the place of business. Neither of these defendants was arrested or searched in the place of business, or Bar, or in any room or place which was used *549 as a part of the Bar. We have searched in vain for any authority in the Beverage Law which authorizes a Beverage inspector to search the person of anyone, and especially, the patrons or customers who may be in the place of business of the licensee. It is true that Section 562.03, F.S.A. requires the licensee to agree that his place of business during business hours shall always be subject to be inspected and searched without a search warrant.
This is not a case where the officers entered into a bar during business hours for the purpose of search and inspection or otherwise, and while in such place of business, observed some customer or other person violating some law. There can be no denial of the right and authority of the Beverage officers to enter the licensed premises during business hours for the purpose of inspecting and searching the premises to determine whether or not the Beverage Laws are being violated. It is also true that while in such place of business the officers have the right and authority to arrest any person in such place of business violating any law in their presence and as an incident to such arrest or in connection therewith, they may lawfully search the person of such individual.
Section 561.07, F.S.A. provides that the supervisors of the Beverage Department shall have access to and the right to inspect the "premises of all licensees" meaning "places of business". There is quite a difference between inspecting or searching the place of business, or the premises, and inspecting and searching all persons who may be in the place of business or on the premises. The right and authority to search or inspect the place of business does not carry with it any right to search the person of the individuals who may be in the place of business or on the premises of the place of business.
The appellee insists that these officers have the right to search the place of business or premises of the licensee and of all persons in the place of business or premises, not simply to enforce the Beverage Law, but also for the purpose of finding out whether any other law of the State of Florida has been violated. Under the contention of the appellee, if a Beverage Department officer has a suspicion that some person not connected with the licensed place of business may have entered thereon or be in such place of business, such officer would have the right, without warrant of any kind, to search the person of such individual in order to ascertain whether or not he had committed some crime not connected with the sale of intoxicating liquor. Such contention includes the entire catalog of crimes without exception. There may be a suspicion that the individual in question is concealing stolen goods or that he carries narcotics on his person or that he has a concealed weapon or has committed manslaughter, murder, rape, robbery or burglary. Such Beverage Department officer, under this theory, would have the right without warrant of any kind to search the person of such individual in order to ascertain whether or not his suspicions are well-founded.
The arrest and search of each of the defendants, Franklin, Broadnax, Cotton and Wright, was illegal and void and in plain violation of Section 22 of the Declaration of Rights of the State Constitution because, (a) the requirement that the licensee shall agree that his place of business may be searched without a search warrant does not include a search of the individuals who may be upon or in the place of business, (b) the search of the persons of each of the four defendants, Franklin, Broadnax, Cotton and Wright, was unreasonable, (c) no warrant had been issued for the search of either of the defendants describing them and the thing or things to be seized, and (d) neither of them was committing any crime in the presence of the officers, prior to, or at the time.
The evidence seized by the officers who unlawfully broke into the back room and searched the same and seized things which they sought to use as evidence should have been suppressed upon the motion made by these four defendants and such evidence together with the things seized from the persons of the four defendants should not have been admitted in evidence over their objections. Solomon v. State, 115 Fla. *550 310, 156 So. 401; White v. State, Fla., 47 So.2d 863.
The appellee urges that the arrests and searches were legal because each of the defendants waived constitutional rights by permitting the search of his, or her, person to be made without resistance or objection. These officers identified themselves as Beverage agents or inspectors. They freely displayed their guns and under such circumstances each of the defendants, except Cotton, submitted to the illegal arrest and illegal search. Cotton, who drove up in an automobile and entered the Bar and through the Bar and the dance hall was chased around the dance hall and eventually submitted to the arrest and search. Under these circumstances there was no consent to arrest and search and there was no waiver by these defendants of the constitutional rights guaranteed to them. Had they resisted arrest or search, they no doubt would have been prosecuted for resisting an officer. 47 Am.Jur., Sec. 46, p. 528; 47 Am.Jur., Sec. 71, p. 547; 79 C.J.S., Searches and Seizures, § 62(b), p. 820; Dunnavant v. State, Fla., 46 So.2d 871.
The appellee places great reliance upon Section 561.29, F.S.A. with reference to the revocation or suspension of a beverage license, and Section 823.05, F.S.A. concerning the maintenance of a nuisance and which makes gambling a nuisance. These sections have nothing to do with criminal prosecutions for violations of the beverage laws or with reference to gambling or any other crime. Although Section 561.29, F.S.A. purports to give the director of the Beverage Department full power to revoke or suspend a license, if the Beverage Director has good cause to believe that the licensee, even though not convicted, has violated any law of any state or territory of the United States or of the United States, such section doesn't even attempt to enlarge the powers of the Beverage Director or other officers to search, without warrant, except to the "place of business" of the licensee. The above section is very comprehensive and covers much territory, but it doesn't attempt to cover searches and seizures and has no application to criminal prosecutions involved in this case.
The appellee contends that, in attempting to detect a nuisance, the beverage officers may inspect and search the licensed place of business, and the persons of all people thereon.
A careful examination of the sections relied upon, that is, 561.07 and 562.03, F.S.A. fails to reveal any attempt to vest authority in the beverage officers to do anything more than enforce the Beverage and Cigarette laws. Section 562.03, F.S.A., which requires the licensee to agree that his "place of business" may be searched without a search warrant, has reference only to the Beverage laws. This section makes it the duty of the Beverage officers to collect taxes and to examine the books and records of the licensee to determine the amount of taxes due. It further makes it their duty to require strict compliance with the laws of the State relating to "the transaction of such business." Sec. 561.07, F.S.A. vests in such officers all of the powers of deputy sheriffs in the enforcement of "the beverage laws and the cigarette tax laws". It would, therefore, appear that the purpose and intent of the Legislature to vest power and authority in the supervisors or other Beverage Department officers to make searches of the place of business, without search warrant, was for the purpose of enforcing the beverage and cigarette tax laws. No other laws are mentioned.
Appellee also cites Section 562.41, F.S.A. as further authority for the arrests, searches and seizures. This section is confined to "the provisions of the beverage law" and "of examining said beverages" for the purpose of determining whether certain provisions of the Beverage Law have been violated. This section does not enlarge the power of search vested in the officers beyond that provided for in Section 562.03, F.S.A. and is confined to a search with reference to "the provisions of the beverage law". If such section should be construed as an attempt to vest in the officers the power to search rooms or places of business other than the licensed premises *551 or to search the persons of individuals not shown to be connected with the licensed premises, the same would be in conflict with Section 22 of the Declaration of Rights of the State Constitution.
The appellee cites the case of City of Jacksonville v. Wilson, 157 Fla. 838, 27 So.2d 108, 110, as authority for its contention that the arrests, searches and seizures in this case were legal and valid and authorized by the Beverage law. In the case of City of Jacksonville v. Wilson, supra, the holder of a beer license sought an injunction against the police officers of the City of Jacksonville to prevent them entering upon his place of business for the purpose of inspecting the same or to conduct a search without first having secured the permission from the owner or having secured a search warrant. The Court simply held:
"Neither is it necessary that the officers have knowledge of violations of the law [referring to beverage law] occurring on the premises before they can lawfully make such search or inspection. Furthermore, the fact that such a visitation may occur in the nighttime does not render a search made without warrant unlawful, provided, of course, the search is made during business hours  * * *."
The opinion in City of Jacksonville v. Wilson, supra, did nothing more than hold: (1) that it was not necessary that officers have actual knowledge of a violation of the Beverage law before they can lawfully make a search of the licensed premises, and (2) that the visitation and search may occur in the nighttime without a search warrant if the search is made during business hours. That case has no application in the case at bar. When the place of business is open during the business hours, any person, except minors, may lawfully enter, and a Beverage Department officer may arrest and search the person of an individual in the place of business if he is violating any law in the presence of such officer. Sec. 901.15, F.S.A.
The case of Thurman v. State, 116 Fla. 426, 156 So. 484, 488, does have an important bearing upon the questions involved in this case. The premises known as the Silver Wing Club in Orange Park, Florida, were searched. The Sheriff passed through the dining room into a kitchen. The dining room was open where the public was invited. From the kitchen the Sheriff went into still another room and there made an arrest and charged the defendant with operating a gambling house. The Sheriff had no warrant for arrest and no search warrant. This Court said:
"In this case the evidence indicates that the sheriff had been hearing for several months that gambling was, at various and sundry times, going on in the Silver Wing Club House, and if the evidence thus coming to him constituted probable cause, the sheriff had ample opportunity to obtain a search warrant before entering and searching the house. It is true that the larger portion of the house seems to have been occupied by a dining room, which was open to the public like a restaurant, and it is possible that the sheriff might have entered and did enter this dining room without committing a forcible trespass, but he also entered and searched a room which was not open to the general public and which had a sign on it indicating that it was a private room. He also searched the kitchen, which was not open to the public, and it was in this private room and in the kitchen that the gambling apparatus was found and seized.
"Even if section 7664 should be held valid, it would have to be strictly construed. See Solomon v. State [112 Fla. 310] 156 So. 401, and special concurring opinion by Chief Justice Davis on denial of rehearing on May 11, 1934.
"But as this statute authorizes a forcible entry without a search warrant, of `any house,' whether dwelling house or any other sort of house, and upon `good reason to believe' rather than upon `probable cause supported by oath or affirmation,' our conclusion is that section 7664 of Comp.Gen.Laws *552 is in conflict with section 22 of the Declaration of Rights of our state Constitution and must therefore be held null and void.
"It necessarily follows that the evidence thus secured and admitted in evidence over the objection of the defendant was erroneously admitted, and that the judgment of the court below must be reversed."
There is no merit in the suggestion that the warrant secured by the Sheriff, after the illegal raid, arrests and search, made them lawful. They were void, and an afterthought, evidenced by a warrant, could not put life into and make legal such void acts. 47 Am.Jur., Sec. 74, p. 550.
There has been, is now, and probably will continue to be for all time, the commission of crimes of every conceivable nature and there is a constant conflict between those organized and unorganized who commit crimes, and the forces of law and order, in an attempt to prevent the commission of crimes or to detect their commission and to see that the violators receive the just penalty of the law. Law enforcement is commendable and necessary in any organized society. If it had not been for the diligent and conscientious efforts of law enforcement officers, no doubt we would live in a state of chaos and anarchy. But although law enforcement is commendable and necessary, such enforcement must be carried on in an orderly fashion and within the limits of the Constitution.
Our Constitutions were ordained and established for the purpose of setting up orderly governments. The first thirteen amendments to the United States Constitution and the Declaration of Rights of the State Constitution were inserted and adopted primarily for the purpose of guaranteeing to the people the enjoyment of certain inalienable rights and for the protection of the people against arbitrary power from whatever source it may emanate. It matters not whether the usurpation of power and the violation of rights guaranteed to the people by the organic law results from the activities of the executive or legislative branches of the government or from officers selected to enforce the law, the rights of the people guaranteed by the Constitutions must not be violated.
Section 22 of the Declaration of Rights of the State Constitution is not the only provision of the organic law of the State for the protection of the people. Section 1 guarantees to the people the right of enjoying life and liberty and possessing and protecting property; Section 2 provides that all political power is inherent in the people and guarantees them the right to alter or amend the government when they consider that the public good requires it; Section 3 guarantees the right of trial by jury and provides that it shall remain inviolate forever; Section 4 requires that the Courts shall be open so that every person shall have remedy for any injury done him; Section 5 guarantees the free exercise and enjoyment of religious profession and worship; Section 6 prohibits giving any preference to any church or taking the money from the public treasury for the aid of any church; Section 7 guarantees the right of the writ of habeas corpus; Section 8 prevents excessive bail and cruel and unusual punishment; Section 9 guarantees the right of bail to everyone except for capital offenses where the proof is evident or the presumption great; Section 13 guarantees to every person the right to fully speak and write his sentiments on all subjects * * *, and that no law shall be passed to restrain or abridge the liberty of speech or of the press, subject to being responsible for the abuse of such right. It is unnecessary to enumerate the other guarantees of the Declaration of Rights for the purposes of this opinion.
If the executive or legislative branches of the government deliberately attempt to deny to the people any of the rights guaranteed to them by the fundamental law hereinabove enumerated, they would be guilty of violating their oaths of office to support, protect and defend the Constitution and would receive the just condemnation of an enlightened and enraged citizenship.
Every particular section of the Declaration of Rights stands on an equal *553 footing with every other section. They recognize no distinction between citizens. Under them every citizen, the good and the bad, the just and the unjust, the rich and the poor, the saint and the sinner, the believer and the infidel, have equal rights before the law. It is just as much a violation of the Constitution to deny a person the right to worship in accordance with the dictates of his conscience, to suppress the freedom of speech or of the press, or to deny a trial by jury, as it is to violate his right to be secure in his person, house, papers and effects against unreasonable searches and seizures except upon warrant secured by an affidavit showing probable cause, etc.
The activities of the law enforcement officers in this case may be compared to the activities of officers during the reign of George III when he attempted to ignore the rights of the people and institute what was known as the "General Warrant" or to the "Writ of Assistance" in the Colonies prior to the Revolution, which resulted in the adoption of the Fourth Amendment to the Constitution of the United States and Section 22 of the Declaration of Rights of the State Constitution.
The history of the times and of the "General Warrant" during the reign of George III and of the "Writ of Assistance" in the Colonies is fully set forth in the opinion of the Supreme Court of the United States in the case of Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 529, 29 L.Ed. 746:
"In order to ascertain the nature of the proceedings intended by the fourth amendment to the constitution under the terms `unreasonable searches and seizures,' it is only necessary to recall the contemporary or then recent history of the controversies on the subject, both in this country and in England. The practice had obtained in the colonies of issuing writs of assistance to the revenue officers, empowering them, in their discretion, to search suspected places for smuggled goods, which James Otis pronounced `the worst instrument of arbitrary power, the most destructive of English liberty and the fundamental principles of law, that ever was found in an English law book;' since they placed `the liberty of every man in the hands of every petty officer.' This was in February, 1761, in Boston, and the famous debate in which it occurred was perhaps the most prominent event which inaugurated the resistance of the colonies to the oppressions of the mother country. `Then and there,' said John Adams, `then and there was the first scene of the first act of opposition to the arbitrary claims of Great Britain. Then and there the child Independence was born.' * * *
"As every American statesman, during our revolutionary and formative period as a nation, was undoubtedly familiar with this monument of English freedom, and considered it as the true and ultimate expression of constitutional law, it may be confidently asserted that its propositions were in the minds of those who framed the fourth amendment to the constitution, and were considered as sufficiently explanatory of what was meant by unreasonable searches and seizures. We think, therefore, it is pertinent to the present subject of discussion to quote somewhat largely from this celebrated judgment. * * *
"`Lastly it is urged as an argument of utility that such a search is a means of detecting offenders by discovering evidence. I wish some cases had been shown where the law forceth evidence out of the owner's custody by process. There is no process against papers in civil causes. It has been often tried, but never prevailed. Nay, where the adversary has by force or fraud got possession of your own proper evidence there is no way to get it back but by action. In the criminal law such a proceeding was never heard of; and yet there are some crimes, such, for instance, as murder, rape, robbery, and house-breaking, to say nothing of forgery and perjury, that are more atrocious than libeling. But our law has provided no paper-search in these cases to help forward the conviction. Whether this proceedeth from the *554 gentleness of the law towards criminals, or from a consideration that such a power would be more pernicious to the innocent than useful to the public, I will not say. It is very certain that the law obligeth no man to accuse himself, because the necessary means of compelling self-accusation, falling upon the innocent as well as the guilty, would be both cruel and unjust; and it would seem that search for evidence is disallowed upon the same principle. Then, too, the innocent would be confounded with the guilty.' * * *
"The principles laid down in this opinion affect the very essence of constitutional liberty and security. They reach further than the concrete form of the case then before the court, with its adventitious circumstances; they apply to all invasions on the part of the government and its employes of the sanctity of a man's home and the privacies of life. It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offense; but it is the invasion of his indefeasible right of personal security, personal liberty, and private property, where that right has never been forfeited by his conviction of some public offense,  it is the invasion of this sacred right which underlies and constitutes the essence of Lord Camden's judgment. Breaking into a house and opening boxes and drawers are circumstances of aggravation; but any forcible and compulsory extortion of a man's own testimony, or of his private papers to be used as evidence to convict him of crime, or to forfeit his goods, is within the condemnation of that judgment. In this regard the fourth and fifth amendments run almost into each other. Can we doubt that when the fourth and fifth amendments to the constitution of the United States were penned and adopted, the language of Lord Camden was relied on as expressing the true doctrine on the subject of searches and seizures, and as furnishing the true criteria of the reasonable and `unreasonable' character of such seizures? Could the men who proposed those amendments, in the light of Lord Camden's opinion, have put their hands to a law like those of March 3, 1863, and March 2, 1867, before recited? If they could not, would they have approved the fifth section of the act of June 22, 1874 [19 U.S.C.A. § 535], which was adopted as a substitute for the previous laws? It seems to us that the question cannot admit of a doubt. They never would have approved of them. The struggles against arbitrary power in which they had been engaged for more than 20 years would have been too deeply engraved in their memories to have allowed them to approve of such insidious disguises of the old grievance which they had so deeply abhorred."
To those interested in the subject we also refer to May's Constitutional History of England, Vol. II, Chapter 11.
In order to establish this "government of laws and not of men" and to adopt a Constitution guaranteeing the rights (enumerated in this opinion) to the people, those who founded this government gave of their time, brains and brawn, when necessary, and of their blood when blood was demanded. It was important to establish orderly government and the rights of the people by a written Constitution. It is just as important to preserve these rights as it was to create them, if our form of government is to be maintained. Officers should not assume, usurp, or exercise the power to violate the organic law in an attempt to detect a crime, or enforce a statute.
The sections of the statute involved do not violate the organic law. However, the activities of the officers purportedly acting under the statutes, as construed by the appellee and acted upon, constituted a plain violation of the rights of the appellants as guaranteed to them by Section 12, with reference to due process, and Section 22, with reference to searches and seizures, of the Declaration of Rights of the Constitution of the State.
Reversed, with directions to set aside the order denying a new trial, the verdict and *555 judgment, and to grant a new trial, as to each of the defendants.
ROBERTS, C.J., and TERRELL, THOMAS, SEBRING and HOBSON, JJ., concur.
HOCKER, Associate Justice, dissents.
HOCKER, Associate Justice (dissenting).
After examining a record which apparently consists more of objections of counsel for the defendants than anything else, the following facts are elicited: What we are concerned with here is a bar, upon entering which, the officers saw a state of affairs that would mean but one thing to any reasonably intelligent person, i.e., that they had walked into the middle of a bolita operation in full swing.
The searches and seizures that our Constitution prohibits are "unreasonable" searches and seizures. This was intended as a shield and not as a sword. It was never the intent or purpose of our founding fathers that these provisions should be purposely used by gangs of organized criminals to prey upon the citizenry of the State.
I therefore dissent from the majority opinion of this court.