596 So.2d 957 (1992)
John Edward TRAYLOR, Petitioner,
v.
STATE of Florida, Respondent.
No. 70051.
Supreme Court of Florida.
January 16, 1992.
Rehearing Denied May 20, 1992.
*959 Nancy Daniels, Public Defender and Davis P. Gauldin, Asst. Public Defender, Tallahassee, for petitioner.
*960 Robert A. Butterworth, Atty. Gen., James W. Rogers, Bureau Chief, Crim. Appeals, and Norma J. Mungenast and Bradford L. Thomas, Asst. Attys. Gen., Tallahassee, for respondent.
SHAW, Chief Justice.
We have for review Traylor v. State, 498 So.2d 1297 (Fla. 1st DCA 1986), based on conflict with State v. DiGuilio, 491 So.2d 1129 (Fla. 1986). We have jurisdiction. Art. V, § 3(b)(3), Fla. Const. We approve the decision of the district court but disapprove its standard for harmless error.

I. FACTS
Tina Nagy was found stabbed to death in her Jacksonville apartment on June 7, 1980. Traylor was charged by information with second-degree murder for the crime on June 11, but was not apprehended at that time. Debra Beason was found stabbed and strangled in Birmingham, Alabama, on August 5, 1980, and Traylor was arrested by Alabama police for the crime the next day under the name of Jason Riley. Traylor was charged in Alabama with the Beason murder and requested and received appointment of counsel on that charge at a preliminary hearing on August 18. Two days later, his lawyer told Traylor not to speak with police and instructed Alabama police not to talk to his client.
A computer check of Traylor's fingerprints revealed his true identity and showed that he was wanted in Florida for the Nagy murder. Detective Warren of the Jacksonville police flew to Birmingham to question him about the Florida crime. On August 22, Warren, who was never told that counsel had been appointed, initiated questioning of Traylor relative to both crimes after advising him of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and obtaining a written waiver. During this session, Traylor confessed orally and in writing to the Florida murder and orally to the Alabama murder. He was tried and convicted of second-degree murder for the Alabama crime, Riley v. State, 501 So.2d 551 (Ala. Crim. App. 1986), and was temporarily returned to Florida in March 1983 and charged by indictment with first-degree murder for the Nagy killing.
Prior to trial on the Florida offense, Traylor moved to suppress the confessions to both crimes,[1] claiming that the statements were obtained in violation of his privilege against self-incrimination under both Article I, Section 9, Florida Constitution, and the Fifth Amendment to the United States Constitution, and of his right to counsel under both Article I, Section 16, Florida Constitution, and the Sixth Amendment to the United States Constitution. The court denied the motion. The confessions were admitted into evidence at trial and the jury found him guilty of second-degree murder. The district court affirmed.
The district court made the following determinations. Under federal law Traylor's Sixth Amendment right to counsel had attached as to the Alabama crime, and counsel had been appointed on that charge. The confession to the crime was obtained through police-initiated questioning without the assistance of counsel and was thus unlawful. As to the confession to the Florida crime, Traylor's Sixth Amendment right to counsel attached at the time the Florida information was issued, but counsel had not been requested or appointed on that charge. Because the Miranda warning had been insufficient to inform Traylor of the availability of his Sixth Amendment right, this confession too was unlawfully obtained, but use of the confessions at trial was harmless error in light of other overwhelming evidence of guilt.
Traylor claims that the district court erred in finding that the use of the confessions was harmless. The State, on the other hand, contends that the district court erred in ruling that the confessions should have been suppressed.
*961 The basic issue before us is whether the trial court erred in admitting the confessions, and, if so, whether the error was harmless. To be held admissible, the confessions must pass muster under both the state and federal constitutions. Consistent with federalist principles set forth below, we examine the confessions initially under our state Constitution; only if they pass muster here need we re-examine them under federal law. Before we apply our state law, however, we must first define its basic contours under Article I, Sections 9 and 16, Florida Constitution.

II. FEDERALISM
The courts of at least eleven states have chosen to interpret the self-incrimination provisions of their own state constitutions in a manner independent of the federal Court's Fifth Amendment jurisprudence.[2] Under our federalist system of government, states may place more rigorous restraints on government intrusion than the federal charter imposes; they may not, however, place more restrictions on the fundamental rights of their citizens than the federal Constitution permits. PruneYard Shopping Ctr. v. Robins, 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980).[3] Federalist principles recognize that although some government intrusion into the life of the individual is inevitable, such intrusion is to be minimized. Government encroachment is thus restricted by both the federal and state constitution.
The federal Constitution secures a common degree of protection for the citizens of all fifty states, but the federal Court has wisely exercised restraint in construing the extent of this protection for several reasons. First, under our federalist system, many important decisions concerning basic freedoms have traditionally inhered in the states. Second, the federal Court's precedent is binding on all jurisdictions within the union; once it settles a matter, further experimentation with potentially rewarding alternative approaches in other jurisdictions is foreclosed. Third, federal precedent applies equally throughout fifty diverse and independent states; a ruling that may be suitable in one may be inappropriate in others. And fourth, the federal union embraces a multitude of localities; the Court oftentimes is simply unfamiliar with local problems, conditions and traditions. See generally San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).
State courts do not suffer these prudential concerns to the same degree as the federal Court. First, unlike their federal counterparts, state courts and constitutions have traditionally served as the prime protectors of their citizens' basic freedoms. State constitutions were the initial and prime charters of individual rights throughout most of our nation's existence:
By 1776 most American citizens enjoyed guarantees against encroachment on their liberties by state governments because most of the original thirteen colonies had adopted constitutions with provisions protecting individual rights. The framers of the federal Bill of Rights, which the states adopted in 1791, naturally relied on these state provisions as sources for their document. The federal *962 document sought to provide citizens with protections against interference by the federal government analogous to existing state constitutional protections against interference by state governments.
For the first one hundred and fifty years of our nation's existence, the origins of state constitutional provisions were of little import for federal constitutional jurisprudence. During this period the federal constitution and state constitutions operated independently in regulating the interaction between government and citizen. The federal Bill of Rights protected citizens only from actions of the federal government, while state constitutions limited only intrusive action by the states. Because state governments affected individuals far more frequently during this period than did the federal government, state constitutions were the primary documents protecting the liberties of the people from governmental interference.
Mary A. Crossley, Note, Miranda and the State Constitution: State Courts Take a Stand, 39 Vand.L.Rev. 1693, 1696 (1986) (footnotes omitted). State courts function daily as the prime arbiters of personal rights.[4] An assertive state court thus impinges on no traditional federal prerogative where basic rights are concerned.
Second, unlike the federal Court, a state court's decision construing its own constitution is controlling only as to courts within that state; the ruling will not stifle the development of alternative methods of constitutional analysis in other jurisdictions.
To stay experimentation ... is a grave responsibility. Denial of the right to experiment may be fraught with serious consequences to the nation. It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel... experiments without risk to the rest of the country.
New State Ice Co. v. Liebmann, 285 U.S. 262, 311, 52 S.Ct. 371, 386-87, 76 L.Ed. 747 (1932) (Brandeis, J., dissenting). And finally, no court is more sensitive or responsive to the needs of the diverse localities within a state, or the state as a whole, than that state's own high court. In any given state, the federal Constitution thus represents the floor for basic freedoms; the state constitution, the ceiling. See Stewart G. Pollock, State Constitutions as Separate Sources of Fundamental Rights, 35 Rutgers L.Rev. 707, 709 (1983).
Federal and state bills of rights thus serve distinct but complementary purposes. The federal Bill of Rights facilitates political and philosophical homogeneity among the basically heterogeneous states by securing, as a uniform minimum, the highest common denominator of freedom that can prudently be administered throughout all fifty states. The state bills of rights, on the other hand, express the ultimate breadth of the common yearnings for freedom of each insular state population within our nation. Accordingly, when called upon to construe their bills of rights, state courts should focus primarily on factors that inhere in their own unique state experience, such as the express language of the constitutional provision, its formative history, both preexisting and developing state law, evolving customs, traditions and attitudes within the state, the state's own general history, and finally any external influences that may have shaped state law.
When called upon to decide matters of fundamental rights, Florida's state courts are bound under federalist principles to give primacy to our state Constitution and to give independent legal import to every phrase and clause contained therein.[5] We *963 are similarly bound under our Declaration of Rights to construe each provision freely in order to achieve the primary goal of individual freedom and autonomy.

III. FLORIDA DECLARATION OF RIGHTS
The text of our Florida Constitution begins with a Declaration of Rights  a series of rights so basic that the framers of our Constitution accorded them a place of special privilege. These rights embrace a broad spectrum of enumerated and implied liberties that conjoin to form a single overarching freedom: They protect each individual within our borders from the unjust encroachment of state authority  from whatever official source  into his or her life. Each right is, in fact, a distinct freedom guaranteed to each Floridian against government intrusion. Each right operates in favor of the individual, against government. This Court over half a century ago addressed the fundamental principle of robust individualism that underlies our system of constitutional government in Florida:
It is significant that our Constitution thus commences by specifying those things which the state government must not do, before specifying certain things that it may do. These Declarations of Rights .. . have cost much, and breathe the spirit of that sturdy and self-reliant philosophy of individualism which underlies and supports our entire system of government. No race of hothouse plants could ever have produced and compelled the recognition of such a stalwart set of basic principles, and no such race can preserve them. They say to arbitrary and autocratic power, from whatever official quarter it may advance to invade these vital rights of personal liberty and private property, "Thus far shalt thou come, but no farther."
State ex rel. Davis v. City of Stuart, 97 Fla. 69, 102-03, 120 So. 335, 347 (1929). No other broad formulation of legal principles, whether state or federal, provides more protection from government overreaching or a richer environment for self-reliance and individualism than does this "stalwart set of basic principles."
Under our Declaration of Rights, each basic liberty and each individual citizen has long been held to be on equal footing with every other:
Every particular section of the Declaration of Rights stands on an equal footing with every other section. They recognize no distinction between citizens. Under them every citizen, the good and the bad, the just and the unjust, the rich and the poor, the saint and the sinner, the believer and the infidel, have equal rights before the law.
Boynton v. State, 64 So.2d 536, 552-53 (Fla. 1953). Each right and each citizen, regardless of position, is protected with identical vigor from government overreaching, no matter what the source. Id. at 552.
Special vigilance is required where the fundamental rights of Florida citizens suspected of wrongdoing are concerned, for here society has a strong natural inclination to relinquish incrementally the hard-won and stoutly defended freedoms enumerated in our Declaration in its effort to preserve public order. Each law-abiding member of society is inclined to strike out at crime reflexively by constricting the constitutional rights of all citizens in order to limit those of the suspect  each is inclined to give up a degree of his or her own protection from government intrusion in order to permit greater intrusion into the life of the suspect. The framers of our Constitution, however, deliberately rejected the short-term solution in favor of a fairer, more structured system of criminal justice:
These rights [enumerated in the Declaration of Rights] curtail and restrain the power of the State. It is more important to preserve them, even though at times a guilty man may go free, than it is to obtain a conviction by ignoring or violating them. The end does not justify the means. Might is not always right. Under *964 our system of constitutional government, the State should not set the example of violating fundamental rights guaranteed by the Constitution to all citizens in order to obtain a conviction.
Bizzell v. State, 71 So.2d 735, 738 (Fla. 1954). Thus, even here  especially here  where the rights of those suspected of wrongdoing are concerned, the framers drew a bright line and said to government, "Thus far shalt thou come, but no farther."

IV. PRIVILEGE AGAINST SELF-INCRIMINATION

A. Florida Section 9

The basic contours of Florida confession law were defined by this Court long ago under our common law. We recognized the important role that confessions play in the crime-solving process and the great benefit they provide; however, because of the tremendous weight accorded confessions by our courts and the significant potential for compulsion  both psychological and physical  in obtaining such statements, a main focus of Florida confession law has always been on guarding against one thing  coercion. We defined the abiding standard for determining the admissibility of a confession nearly a century and a half ago:
To render a confession voluntary and admissible as evidence, the mind of the accused should at the time be free to act, uninfluenced by fear or hope. To exclude it as testimony, it is not necessary that any direct promises or threats be made to the accused. It is sufficient, if the attending circumstances, or declarations of those present, be calculated to delude the prisoner as to his true position, and exert an improper and undue influence over his mind.
Simon v. State, 5 Fla. 285, 296 (1853). The test thus is one of voluntariness, or free will, which is to be determined by an examination of the totality of the circumstances surrounding the confession.[6] This determination is to be made by the judge, in the absence of the jury, based on a multiplicity of factors, including the nature of the questioning itself. Nickels v. State, 90 Fla. 659, 667, 106 So. 479, 483 (1925).
Because confessions are oftentimes rendered in private where the potential for compulsion is great, this Court has long recognized that such statements must be considered with caution. Coffee v. State, 25 Fla. 501, 510, 6 So. 493, 496 (1889). To ensure voluntariness, we traditionally have required as a matter of state law that one charged with a crime be informed of his rights prior to rendering a confession. Over a century ago, we held that before a prisoner can be questioned by an officer at a preliminary hearing the officer must "caution the prisoner, to put him on his guard, and to inform him as to his rights in the premises." Id., 25 Fla. at 510, 6 So. at 496.[7] Before being questioned, the accused must be told that "he need not say anything to criminate himself, and what he did say would be taken down and used as evidence against him." Green v. State, 40 Fla. 474, 476, 24 So. 537, 538 (1898). Confessions obtained in violation of these rules were inadmissible at trial.[8]
The common law principles governing confessions and other self-incriminating statements have long been matters of constitutional import in Florida. Section 9 of our state Declaration of Rights provides in part that
[n]o person shall be ... compelled in any criminal matter to be a witness against himself.
Art. I, § 9, Fla. Const. As early as 1896 this Court recognized that our common law principles governing confessions are subsumed under the constitutional proscription concerning compelled self-incrimination:
It is an ancient maxim of the law that no man shall be compelled to criminate himself. The origin and necessity of this maxim, as others of the common law, *965 grew out of conditions found in the early history of English jurisprudence in reference to the administration of criminal law, and which, it must be admitted, evince many traces of cruelty and barbarity. There was a time when suspected persons were not only deprived of an opportunity to have witnesses produced in their favor, and of the advice and aid of counsel, but were put to torture for the purpose of extorting from them confessions of guilt, or statements which could be used in securing their conviction. Securing the conviction of even suspected persons by such means justly became odious, and we find the humanity of the common law proclaiming that no man shall be compelled to criminate himself,  "Nemo tenetur seipsum prodere." This principle of the common law was fully recognized in this country when the formation of governments began, and we find it imbedded in the national and all the state constitutions that we have examined. In our constitution it is found in the [ninth] section....
Ex parte Senior, 37 Fla. 1, 16, 19 So. 652, 654 (1896).[9] In the same case, we concluded that in order for this constitutional privilege to accomplish its intended purpose it must be broadly construed. Id., 37 Fla. at 16, 19 So. at 654. We have since reaffirmed both the constitutional status of Florida confession law under our Declaration of Rights[10] and the broad scope of the constitutional privilege[11] on many occasions.
As a matter of policy, this Court recognizes the indispensible role that both confessions and interrogation play in the successful investigation and prosecution of crime:
Despite modern advances in technology of crime detection, offenses frequently occur about which things cannot be made to speak. And where there cannot be found innocent human witnesses to such offenses, nothing remains  if police investigation is not to be balked before it has fairly begun  but to seek out possibly guilty witnesses and ask them questions, witnesses, that is, who are suspected of knowing something about the offense precisely because they are suspected of implication in it.
The questions which these suspected witnesses are asked may serve to clear them. They may serve, directly or indirectly, to lead the police to other suspects than the persons questioned. Or they may become the means by which the persons questioned are themselves made to furnish proofs which will eventually send them to prison or death. In any event, whatever its outcome, such questioning is often indispensable to crime detection.
Culombe v. Connecticut, 367 U.S. 568, 571, 81 S.Ct. 1860, 1861-62, 6 L.Ed.2d 1037 (1961). We adhere to the principle that the state's authority to obtain freely given confessions is not an evil, but an unqualified good. McNeil v. Wisconsin, ___ U.S. ___, 111 S.Ct. 2204, 2210, 115 L.Ed.2d 158 (1991).
Based on the foregoing analysis of our Florida law and the experience under Miranda and its progeny,[12] we hold that to *966 ensure the voluntariness of confessions, the Self-Incrimination Clause of Article I, Section 9, Florida Constitution, requires that prior to custodial interrogation in Florida suspects must be told that they have a right to remain silent, that anything they say will be used against them in court, that they have a right to a lawyer's help,[13] and that if they cannot pay for a lawyer one will be appointed to help them.
Under Section 9, if the suspect indicates in any manner that he or she does not want to be interrogated, interrogation must not begin or, if it has already begun, must immediately stop. If the suspect indicates in any manner that he or she wants the help of a lawyer, interrogation must not begin until a lawyer has been appointed and is present or, if it has already begun, must immediately stop until a lawyer is present. Once a suspect has requested the help of a lawyer, no state agent can reinitiate interrogation on any offense throughout the period of custody unless the lawyer is present,[14] although the suspect is free to volunteer a statement to police on his or her own initiative at any time on any subject in the absence of counsel.
A waiver of a suspect's constitutional rights must be voluntary, knowing, and intelligent, and, where reasonably practical, prudence suggests it should be in writing.[15] A prime purpose of the above safeguards is to maintain a bright-line standard for police interrogation; any statement obtained in contravention of these guidelines violates the Florida Constitution and may not be used by the State. These guidelines apply only to statements obtained while in custody[16] and through interrogation;[17] they do not apply to volunteered statements initiated by the suspect or statements that are obtained in noncustodial settings or through means other than interrogation. While our state voluntariness test is still applicable in those cases where actual compulsion is alleged in obtaining a self-incriminating statement, adherence to the above safeguards constitutes significant proof that the resulting statement was voluntary.

V. RIGHT TO CHOOSE REPRESENTATION

A. Florida Section 16

The Counsel Clause of the Florida Constitution is contained in Section 16 of our Declaration of Rights, which provides in part:
In all criminal prosecutions the accused shall, upon demand, ... have the right ... to be heard in person, by counsel or both... .
*967 Art. I, § 16, Fla. Const. Our state clause embodies an express right to choose the manner of representing oneself  either pro se or through counsel  against criminal charges.
The right to choose one's manner of representation in a criminal trial has been recognized historically by both this Court and our state legislature as an obvious but important state right belonging to the accused. At the turn of the century, in Cutts v. State, 54 Fla. 21, 45 So. 491 (1907), this Court ruled that "[e]very person accused of crime has a right to have counsel to aid him in his defense, but no one is compelled to employ counsel." Id., 54 Fla. at 24, 45 So. at 492 (quoting Barnes v. Commonwealth, 92 Va. 794, 23 S.E. 784 (1895)). We reaffirmed this view a few years later: "It does not appear that the assistance of counsel was `desired by' the accused... . A party on trial for a felony may waive his right to have counsel, and may conduct his own defense... ." Weatherford v. State, 76 Fla. 219, 223, 79 So. 680, 681-82 (1918). The right was long ago codified by the legislature;[18] our modern statutes[19] and rules of procedure[20] continue to protect it.
The language of our Counsel Clause is simple and direct and we conclude that the framers intended it to mean just what it says: In all criminal prosecutions, the defendant may choose to be heard either by himself or through counsel. This reading is backed by both English and colonial law. Under early English common law, it had been the practice to deny the defendant any choice as to the means of defending himself against state charges in serious criminal cases. Retained counsel was permitted in civil and misdemeanor trials but was severely limited in treason and felony trials:
In civil causes and on the trial of charges of misdemeanor, the parties were entitled to the aid of counsel in eliciting the facts, and in presenting both the facts and the law to the court and jury; but when the government charged a person with treason or felony, he was denied this privilege. Only such legal questions as he could suggest was counsel allowed to argue for him... .
1 Thomas M. Cooley, Cooley's Constitutional Limitations 698 (1927). An era of reform, however, began with the Treason Act of 1695, which authorized counsel for the accused in treason trials, but not felony trials. In this and subsequent reform legislation, "[t]he right to counsel was viewed as guaranteeing a choice between representation by counsel and the traditional practice of self-representation." Faretta v. California, 422 U.S. 806, 825, 95 S.Ct. 2525, 2536, 45 L.Ed.2d 562 (1975) (emphasis added). The ban on counsel in felony cases in England was finally lifted in 1836.
The colonies unequivocally rejected the English felony rule and accorded to the individual the fundamental right to choose his own method of defense:
Colonial judges soon departed from ancient English practice and allowed accused felons the aid of counsel for their defense. At the same time, however, the basic right of self-representation was never questioned. We have found no instance where a colonial court required a defendant in a criminal case to accept as his representative an unwanted lawyer. Indeed, even where counsel was permitted, the general practice continued to be self-representation.
The right of self-representation was guaranteed in many colonial charters and declarations of rights. These early documents establish that the "right to counsel" meant to the colonists a right to choose between pleading through a lawyer and representing oneself. After the Declaration of Independence, the right of self-representation, along with other rights basic to the making of a defense, entered the new state constitutions in wholesale fashion. The right to counsel was clearly thought to supplement the primary right of the accused to defend himself... . And when the Colonies or *968 newly independent States provided by statute rather than by constitution for court appointment of counsel in criminal cases, they also meticulously preserved the right of the accused to defend himself personally.
Id. at 827-30, 95 S.Ct. at 2537-38 (emphasis added) (footnotes omitted). This right to choose has since been recognized by the federal Court[21] and is preserved in the constitutions of at least thirty-six states.[22]
Based on the foregoing, we hold that a prime right embodied by the Section 16 Counsel Clause is the right to choose one's manner of representation against criminal charges.[23] In order for this right to have meaning, it must apply at least at each crucial stage[24] of the prosecution. For purposes here, a "crucial stage" is any stage that may significantly affect the outcome of the proceedings. Because a prime interest[25] that is protected is the right of the individual to exercise self-determination in the face of criminal charges, prosecution begins[26] under the Counsel Clause when an accused is charged with a criminal act, as set out below.[27]
Once the defendant is charged  and the Section 16 rights attach  the defendant is entitled to decide at each crucial stage of the proceedings whether he or she requires the assistance of counsel. At the commencement of each such stage, an unrepresented defendant must be informed of the right to counsel and the consequences of waiver. Any waiver of this right must be knowing, intelligent, and voluntary, and courts generally will indulge every reasonable presumption against waiver of this fundamental right.[28] Where the right to counsel has been properly waived, the State may proceed with the stage in issue; but the waiver applies only to the present stage and must be renewed at each subsequent crucial stage where the defendant is unrepresented.[29]
Once the right to counsel has attached and a lawyer has been requested or retained, the State may not initiate any crucial confrontation with the defendant on that charge in the absence of counsel throughout the period of prosecution,[30] although the defendant is free to initiate a confrontation with police at any time on any subject in the absence of counsel. Because a prime interest protected by the Counsel Clause is the right to exercise self-determination in the face of specific criminal charges, the right to counsel is charge-specific[31] and invocation of the right on one offense imposes no restrictions on police inquiry into other charges for which the right has not been invoked. Evidence obtained by the State in contravention of these guidelines violates the Florida Constitution and may not be used by the State.
The right to choose, as envisioned by our framers, recognizes the defendant's right to exercise freedom of choice in relying *969 on his or her own abilities and assets in obtaining the manner of representation best suited for the defense. It is a highly personal choice concerning the allocation of one's own individual resources. The Counsel Clause, standing alone, thus imposes no obligation on the state to provide court-appointed counsel in order to protect this particular right. The right to appointed counsel arises when Section 16 is read in conjunction with the Equal Protection Clause of Article I, Section 2, Florida Constitution.

B. Florida Section 2

The Equal Protection Clause of our state Constitution provides: "All natural persons are equal before the law... ." Art. I, § 2, Fla. Const. We conclude that the right of indigent defendants to assistance of court-appointed counsel in criminal prosecutions is constitutionally required under this and the Counsel Clause.
This Court has historically recognized the general right of indigent defendants to assistance of court-appointed counsel in criminal prosecutions. Almost a century ago, in Cutts v. State, 54 Fla. 21, 45 So. 491 (1907), we stated:
It has been the general practice in trial courts in this state, when a party charged with felony has been brought to the bar for arraignment, to inquire of the accused whether he had counsel to represent him, and if, upon inquiry, it developed that he had no attorney and was unable to employ one, to ask the accused whether he desired one to represent him. If he signified his desire to be represented by counsel, then it has been the practice for the trial judge to appoint some attorney to represent the accused.
Id., 54 Fla. at 23, 45 So. at 491. Although this right was originally viewed as discretionary[32] and was limited by the legislature to capital cases,[33] the principle underlying the right nevertheless endured and is now codified in our statutes[34] and rules of procedure.[35]
The Equal Protection Clause of our state Constitution was framed to address all forms of invidious discrimination[36] under the law, including any persistent disparity in the treatment of rich and poor. We conclude that our clause means just what it says: Each Florida citizen  regardless of financial means  stands on equal footing with all others in every court of law throughout our state. See generally Palm Harbor Special Fire Control Dist. v. Kelly, 516 So.2d 249, 251 (Fla. 1987). Nowhere is the right to equality in treatment more important than in the context of a criminal trial, for only here can a defendant be deprived by the state of life and liberty.
In light of the widely-recognized and oftentimes decisive role the lawyer plays in the judicial process, we conclude that our state Constitution requires that the Section 16 right to counsel be made available to impoverished defendants. No Florida citizen can be deprived of life or liberty in a criminal proceeding simply because he or she is too poor to establish his or her innocence.
This Court has long recognized in our rules of procedure this right of impoverished defendants to court-appointed counsel commencing at the point in time when they are charged, either formally or informally, with a criminal act. Florida Rule of Criminal Procedure 3.111 provides in part:
(a) When Counsel Provided. [An indigent person] shall have counsel appointed when he is formally charged with an offense, or as soon as feasible after custodial restraint or upon his first appearance *970 before a committing magistrate, whichever occurs earliest.
In other words, a defendant is entitled to counsel at the earliest of the following points: when he or she is formally charged with a crime via the filing of an indictment or information,[37] or as soon as feasible after custodial restraint,[38] or at first appearance.[39] Although rule 3.111 speaks specifically to indigents, we conclude that the procedural rights of nonindigents under Section 16 are at least coextensive with those of indigents.
Rule 3.111 was adopted from The American Bar Association's Standards for Criminal Justice[40] and was intended to provide equal representation,[41] commencing early in the proceedings.[42] The rule is grounded in Sections 2 and 16 of our state Constitution. Assistance of counsel  either retained or appointed  begins under these two sections as provided in rule 3.111.[43]

VI. APPLICATION TO PRESENT CASE
Applying the foregoing Florida law to the present case, we initially address the Section 9 self-incrimination issue. In his motion to suppress, Traylor claimed that both confessions were obtained in violation of his privilege against self-incrimination under Section 9. We conclude that the trial court properly rejected this claim. The statements were not obtained in violation of the Section 9 safeguards. Prior to conducting the questioning session during *971 which the confessions were given, Detective Warren handed a rights form to Traylor and asked him to read it aloud. The form contained the following statement:
You do not have to make a statement or say anything. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before you make a statement or before any questions are asked of you and to have the lawyer with you during any questioning. If you cannot afford to hire a lawyer, one will be appointed for you before any questioning, if you wish. If you do answer questions, you have the right to stop answering questions at anytime and consult with a lawyer.
Traylor read the form aloud. Warren then read the form to Traylor and Traylor signed it, indicating that he had been informed of his rights and voluntarily waived them. Detective Warren and Sergeant Gay then signed the form as witnesses. During the course of the interview, Traylor never indicated a desire to consult with a lawyer or to stop the questioning. The record contains competent substantial evidence to support the conclusion that Traylor was adequately informed of his rights and validly waived them.
Two days prior to the interrogation session wherein Traylor confessed to both crimes, the lawyer representing him on the Alabama offense, Pete Johnson, told Detective Grubbs of the Alabama police not to talk to his client in the absence of counsel. In his motion to suppress, Traylor claimed that the subsequent interrogation in the absence of counsel violated his constitutional privilege against self-incrimination. The trial court found that "[o]n August 20, 1980, attorney Pete Johnson ... called Detective George Grubbs of the Birmingham Police Department and told him he did not want the police to talk with his client." After hearing Johnson's testimony, however, the court concluded that "[f]or [self-incrimination] purposes, the Defendant never personally invoked his right to counsel."
The Section 9 right to counsel ensures voluntariness by protecting those individuals who express a personal inability to undergo the rigors of custodial interrogation unassisted by legal counsel. See supra pp. 964-966. The record contains adequate evidence to support the conclusion that Johnson's statement to police was not based on a personal inability on Traylor's part to deal with the pressures of interrogation, but rather was a routine request by newly appointed counsel.[44] In fact, Johnson testified that it has become his "practice as a defense lawyer when [he] get[s] a letter of appointment just to go and carte blanch [sic] tell anybody associated with the investigation not to speak to [his] client." We note that the trial court had the opportunity to observe Johnson's extensive live testimony and question him.[45] Competent substantial evidence supports the trial court's finding that Traylor never invoked his privilege against self-incrimination.
The circumstances surrounding the confessions indicate that the statements were not the product of coercion, but rather were voluntarily given. The trial court made the following finding:
Commencing at 9:20 A.M., and over the next 30 to 45 minutes, the Defendant gave oral statements to Detective Warren admitting his guilt to the Jacksonville and Birmingham homicides. There was a mid-morning break and beginning at 11:10 A.M., the Defendant reduced his oral confession regarding the Jacksonville homicide to writing. That writing was completed at 11:59 A.M.
... .
The evidence clearly reflects that at the time the oral and written statements were made on both the Florida and Alabama homicides the Defendant had been fully advised of his Constitutional rights, ... executed a waiver of those Constitutional *972 rights, fully understood those rights, intelligently waived each and every one of them, and thereafter freely and voluntarily spoke with Detective Warren of Jacksonville, Florida. The Defendant had not been offered any hope of reward, better treatment, promise of leniency, or inducement in order to get him to make those statements. The Defendant never personally invoked his right to have counsel present nor did he ever indicate that he wished not to speak with Detective Warren. At all times during the morning of August 22, 1980, the defendant was sober, calm, collect[ed], not upset, and not nervous. Both statements confessing to both crimes were freely and voluntarily made.
The record contains competent substantial evidence to support the trial court's finding that the confessions were freely given.
Next, we address the Section 16 right-to-counsel claim. In his motion to suppress, Traylor claimed that both confessions were obtained in violation of his Section 16 right to counsel. We agree as to the Alabama offense. Traylor was arrested and charged with the Alabama offense on August 6, and had counsel appointed at a preliminary hearing on August 18. Under Florida law, the Section 16 right attaches at charging. Because Traylor subsequently requested counsel at the preliminary hearing and a lawyer was appointed, Florida police were constitutionally barred from initiating any crucial confrontation with him on that charge in the absence of his lawyer for use in a Florida court. The confession to the Alabama murder that was obtained by Florida police through police-initiated questioning after counsel was appointed was thus obtained in violation of Section 16 and was inadmissible in the Florida proceeding.
As to the Florida offense, Traylor was charged by information with the crime on June 11. His Section 16 right to counsel thus attached at that time. However, when police initiated questioning on August 22, Traylor had not retained or requested appointment of counsel on that charge.[46] The question here is whether the police, prior to initiating questioning, adequately informed Traylor of his Section 16 rights and the consequences of waiver, and then obtained a valid waiver.
Any waiver of the Section 16 right to counsel must be knowing, intelligent, and voluntary. Our rules of criminal procedure provide additional express guidelines. Florida Rule of Criminal Procedure 3.111 provides in part:
(d) Waiver of Counsel.
(1) The failure of a defendant to request appointment of counsel or his announced intention to plead guilty shall not, in itself, constitute a waiver of counsel at any stage of the proceedings.
(2) A defendant shall not be deemed to have waived the assistance of counsel until the entire process of offering counsel has been completed and a thorough inquiry into accused's comprehension of that offer and his capacity to make that choice intelligently and understandingly has been made.
(3) No waiver shall be accepted where it appears that the defendant is unable to make an intelligent and understanding choice because of his mental condition, age, education, experience, the nature or complexity of the case, or other factors.
(4) A waiver of counsel made in court shall be of record; a waiver made out of court shall be in writing with not less than two attesting witnesses. Said witnesses shall attest the voluntary execution thereof.
(5) If a waiver is accepted at any stage of the proceedings, the offer of assistance of counsel shall be renewed by the court at each subsequent stage of the proceedings at which the defendant appears without counsel.
As noted above, prior to questioning Traylor the police informed him of his rights, including the following:
Anything you say can be used against you in court. You have the right to talk *973 to a lawyer for advice before you make a statement or before any questions are asked of you and to have the lawyer with you during questioning. If you cannot afford to hire a lawyer, one will be appointed for you before any questioning, if you wish.
The clear language of this warning was sufficient for general Section 16 purposes. First, Traylor was adequately informed of his rights: He was expressly told that he had the right to have a lawyer's assistance prior to and during questioning and that if he could not afford a lawyer one would be appointed. This is the core of the Section 16 right to counsel. Second, he was sufficiently apprised of the consequences of waiver: He was explicitly told that anything he said could be used against him in a criminal prosecution. This is the ultimate adverse consequence of a decision to submit to police questioning unassisted by counsel. Traylor's waiver of his Section 16 rights concerning the Florida crime was thus knowing and intelligent, and, as noted above, we agree with the court's finding that the statements were voluntary.[47]
The waiver also complied with the specific requirements of rule 3.111(d). First, assistance of counsel clearly was offered to Traylor, and Detective Warren extensively inquired[48] into Traylor's understanding of the offer. Second, the record contains no competent evidence showing that the waiver was the result of a deficiency in the defendant's mental condition, age, education, experience, or any other factor. And third, the waiver was in writing, signed by two attesting witnesses. We thus conclude that Traylor's waiver of his Section 16 right to counsel was valid as to the Florida offense.
We must finally determine whether the trial court's error in allowing the confession to the Alabama murder to be admitted into evidence at trial was harmless. We announced the abiding standard for applying the harmless error test in State v. DiGuilio, 491 So.2d 1129, 1139 (Fla. 1986): "If the appellate court cannot say beyond a reasonable doubt that the error did not affect the verdict, then the error is by definition harmful." In the present case, the jury had before it the following evidence of guilt: Traylor had threatened Nagy's life prior to the murder, his hair was found on her body, his bloody handprint was found on the wall near the body, he confessed to the murder to police, and he wrote letters to his Florida and Alabama judges confessing to both murders and requesting to be put to death for the crimes. We find beyond a reasonable doubt that the erroneous admission of the confession to the Alabama murder did not affect the jury's verdict. Accordingly, we approve the decision of the district court[49] but disapprove its standard for harmless error.[50]
It is so ordered.
OVERTON, McDONALD and GRIMES, JJ., concur.
BARKETT, J., concurs in part and dissents in part with an opinion, in which KOGAN, J., concurs.
*974 KOGAN, J., concurs in part and dissents in part with an opinion, in which BARKETT, J., concurs.
BARKETT, Justice, concurring in part, dissenting in part.
I concur in Parts II through IV, and like Justice Kogan, in most of Part V of the majority opinion. I dissent as to the application of the law in Part VI but concur in the result because admitting the Florida confession was harmless error.
I agree with the recital of the law on federalism. It is, of course, axiomatic that Florida can interpret its constitution independently of the federal courts. I certainly concur with the incorporation of the principles and rationales expressed in Miranda, Minnick, Roberson, and Edwards as part of Florida's constitutional protections. I also agree with the majority that the right to counsel under article I, section 16 of the Florida Constitution attaches at the earliest of the following points: upon being formally charged with a crime via indictment or information, as soon as feasible after custodial restraint, or at first appearance. I part company with the majority when it fails to apply the principles it is adopting to the facts of this case, and with the majority's apparent conclusion that a request for counsel at a first appearance hearing on a specific charge is not an assertion of counsel rights under article I, section 9 of the Florida Constitution, barring state-initiated custodial questioning on any matter.
Indigent defendants are entitled to a lawyer for one basic purpose  to assist them in dealing with the power of the State. They are first entitled to a lawyer under article I, section 9, to advise and protect them when the State attempts to interrogate them while in custody. The right to this assistance obviously continues throughout the defendant's detention. When the initial restraint becomes a court case, the accused is then entitled under article I, section 16 to a lawyer's assistance, not only during custodial interrogation but also throughout any and all necessary stages of the case.
An accused is usually informed of the right to counsel either by the police or by a judge. The police will inform an accused of the right to counsel before any attempt to interrogate, and a judge will advise an accused of the right to counsel at the initial court hearing and thereafter at anytime the accused appears without a lawyer. Neither the police nor the judge differentiate between constitutional sources of the right to counsel or announce which constitutional provision is affected at any given stage of the proceedings. The accused is simply advised that a lawyer will be appointed if the accused is indigent. There is no explanation, for example, that the right to counsel during interrogations may exist simultaneously under both section 9 and section 16 of the constitution. Of course, the legal distinction is totally lost upon the accused. I venture to say, without intending any insult, that there are judges and lawyers who do not understand the distinction. It is, thus, completely unrealistic to expect an accused to understand it. Indeed, the Supreme Court in Patterson v. Illinois, 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988), implicitly recognized that any such differentiation in the context of the Fifth and Sixth Amendments is silly.
Patterson held that Miranda warnings suffice to inform the accused of his right to counsel under the Sixth Amendment as well as under the Fifth Amendment and waiver of the Fifth Amendment right constitutes waiver of the Sixth Amendment right. The Court held in Patterson that when an accused says he or she does not want a lawyer, that means the accused does not want a lawyer period. The effect of the waiver applies to both constitutional provisions to which an accused is entitled. Implicit in that conclusion is the converse proposition: When an accused invokes the right to a lawyer by requesting counsel, the request is for all purposes for which he or she is entitled to a lawyer. To say that the accused can waive the Sixth Amendment right to counsel by waiving the Fifth, but cannot invoke the protections of the Fifth when he or she invokes the Sixth, is bafflingly illogical. If the Miranda warnings are sufficient to inform the accused of his Sixth Amendment right to counsel, *975 then surely the invocation of the Sixth Amendment right to counsel is sufficient to inform the State that the accused desires counsel for any custodial questioning.
In this case, as Justice Kogan notes, Traylor asserted his section 9 right to counsel through his lawyer. Additionally, however, he personally asked for a lawyer in the Alabama court before he was interrogated. A lawyer was appointed for him. Accordingly, I would hold that the police were thereafter prohibited from initiating questioning of Traylor as to either the Alabama or the Florida charge in the absence of his lawyer. See Arizona v. Roberson, 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988). I would therefore find that the Florida confession was obtained in violation of Traylor's right to counsel under article I, section 9 of the Florida Constitution, and thus was inadmissible. Nonetheless, I agree with Justice Kogan's analysis that in light of the other evidence in the case, the admission of this confession was harmless.
KOGAN, J., concurs.
KOGAN, Justice, concurring in part, dissenting in part.
I concur with the result, with Parts II through IV, and with the bulk of Part V of the majority opinion, at least as far as they go. I write separately to address a federal-law issue and to dissent from Part VI.
As is obvious from the majority opinion, the record discloses that Traylor's attorney had invoked his client's Fifth Amendment right not to be interrogated without assistance of counsel. This was done prior to the time the Florida authorities questioned Traylor. Majority op. at 960, 971. Under traditional and long-standing principles of federal law, this sequence of events presumptively would render Traylor's statements inadmissible under Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and Arizona v. Roberson, 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988), because the authorities  not Traylor  clearly initiated the contact in question.[51]
The majority skirts this problem by affirming the trial court's finding that "Defendant never personally invoked his right to counsel." Majority op. at 971. For the reasons expressed more fully below, I believe this finding is erroneous as a matter of federal law, since it rests on the false assumption that an attorney cannot invoke the client's constitutional rights. I also believe the majority falls into this error partly because it has overlooked the full factual record regarding Johnson's actions.

A. The Facts
In its relevant factual findings, the trial court below described the following sequence of events:

On August 18, the Defendant appeared before a judge in District Court, Birmingham, Alabama, Case Number DC80-4246, for the purposes of first appearance on the Alabama charge. Court records indicate the Defendant was adjudicated insolvent and appointed the services of Pete Johnson (Defendant's Exhibit # 2).
... .

On August 20, 1980, attorney Pete Johnson told the Defendant not to talk to the police. Also on that date, the attorney called Detective George Grubbs of the Birmingham Police Department and told him he did not want the police to talk to his client. This request was not communicated by Grubbs to any other law enforcement officer of either Alabama or Florida.
It was learned that the individual arrested in Alabama known as Jason William Riley, Jr., was the same as John Edward Traylor, who was wanted in Jacksonville, Florida. In the afternoon of August 21, 1980, Detective Gay of Birmingham contacted Jacksonville Detective Warren directly about the two cases. On the morning of August 22, 1980, Detective Warren left for and arrived in Birmingham for the purpose of interviewing the Defendant exclusively regarding the Jacksonville homicide of Tina Nagy.

*976 At approximately 9:20 A.M., the Defendant was brought from the county jail to the District Attorney's office in Birmingham at the request of Detective Gay. The Defendant raised no objection and did not refuse to go.
Commencing at 9:20 A.M., and over the next 30 to 45 minutes, the Defendant gave oral statements to Detective Warren admitting his guilt to the Jacksonville and Birmingham homicides. There was a mid-morning break and beginning at 11:10 A.M., the Defendant reduced his oral confession regarding the Jacksonville homicide to writing (State's Exhibit #2). That writing was completed at 11:59 A.M. At 12:01 P.M., the Defendant requested and was allowed to call his wife who was on the psychiatric floor at the University of Alabama at Birmingham Hospital. That telephone call ended at approximately 1:00 P.M. At that time, the Defendant was in the presence of Detective George Grubbs alone who was interviewing him regarding the Alabama homicide. The Defendant's attorney abruptly appeared, interrupted the interrogation, and instructed Detective Grubbs that there would be no more questions and answers.

(Emphasis added). Because these factual findings are supported by competent substantial evidence, this Court must accept them as true. In re Baldridge's Estate, 74 So.2d 658, 660 (Fla. 1954).
The sequence of events on August 20, 1980, was further illuminated by the testimony of Johnson at the suppression hearing below, upon which the trial court relied in making its findings. Johnson first noted that he had received the letter of appointment from the trial court on August 19, and the next day began preparation for the case. On questioning by the trial court, Johnson described what he did on August 20:
THE COURT: Let me see here just a second. Were you aware when you went  before you went to the Police Department to give them that message [not to interrogate Traylor], had you seen or spoken with Mr. Traylor since receiving the letter of appointment? Between the letter of appointment on the 19th, going to the Police Department on the 20th, had you seen or spoken to him?
A [by JOHNSON] Yes, sir.
THE COURT: I want to know  you had seen him and spoken to him?
A [by JOHNSON] Yes, sir.
These statements by Johnson are entirely consistent with the trial court's factual findings. Obviously, the trial court itself was concerned whether the message Johnson communicated to the police arose from privileged communications with Traylor, thus presumptively reflecting Traylor's own desires at that point in time. The majority concedes that the attorney-client privilege was an important issue in the suppression hearing. Majority op. at 971 n. 45.
As the majority notes, Johnson also stated that his usual practice was to tell police not to speak with his clients. Majority op. at 971. However, the majority then goes on to make a wholly unwarranted assumption based on this rather unremarkable fact. The majority assumes that Johnson's statements to police were made without first consulting with Traylor about the matter.[52] Although the majority fails to state this assumption expressly, it nevertheless is the only possible way of interpreting the majority's treatment of this issue.
However, this assumption is severely undercut by the facts we know to be true, *977 based on Johnson's testimony and the trial court's factual findings. Nothing in the material quoted by the majority suggests that Johnson's usual "practice" was to talk to police before he talked with his client. Nothing anywhere else in the record supports this surprising conjecture. Nothing suggests that Johnson's practice was to invoke the right to counsel without knowledge or participation of the client. Nothing suggests that Johnson failed to obtain his client's consent to invoke the right in this case. Indeed, there is much saying exactly the opposite.
We know, for example, that Johnson talked with his client before he talked with the police. This fact was clearly established in the trial court's questioning of Johnson during the suppression hearing, quoted above. We also know that, when consulting with Traylor, Johnson told his client not to talk to police. The trial court's findings expressly say so, as quoted above.
It thus is highly likely that, during this conversation, Johnson told his client what he intended to say to the police and obtained his client's agreement. The record is at least as consistent with this conclusion as with the one the majority reaches. All we know for certain is that Johnson routinely told police not to talk to his clients. We do not know if he did so without obtaining his clients' agreement to this procedure, as the majority erroneously finds.
I also must admit some surprise that the majority is expressly and self-consciously supplementing the factual record with its own personal conjecture. Fact-finding is not the proper role of any court hearing an appeal, and certainly not the subjective and dubious form of fact-finding that has occurred in the majority opinion. When we are deciding a man's fate, as we are here, it is utterly improper to rest that decision on hunches or speculation.
Indeed, the majority nowhere cites to any portion of this record disclosing that Johnson was acting beyond the scope of Traylor's wishes in this case. It would be impossible to do so, because all of Traylor's statements to Johnson were privileged and therefore inadmissible. § 90.502, Fla. Stat. (1985). Throughout the suppression hearing below, the trial court recognized this fact and consistently ruled that Johnson could not be required to testify about conversations with his client, a fact the majority itself acknowledges. Majority op. at 971 n. 45. In addition, Traylor himself is privileged to remain silent, and therefore cannot be required to testify about conversations with his counsel. U.S. Const. amend. V; art. I, § 9, Fla. Const. These privileges are all the more pressing here because the majority opinion apparently requires Traylor either to abandon them or accept the admissibility of an otherwise tainted confession. See majority op. at 971 & 971 n. 45.
If anything, we must presume that Johnson's statements to the police reflected the desires of Traylor. There is no lawful way to rule otherwise without violating the right to counsel, the sanctity of the attorney-client relationship, or Traylor's privilege to remain silent. Accordingly, I must respectfully reject the majority's conjecture that Johnson was not acting on behalf of Traylor in invoking the right to counsel. We simply do not know this to be true.
And I would like to note for the record that, if the majority insists upon this course of action, the only proper thing to do would be to remand this cause to the trial court for a proper factual finding of the issue. That way, Traylor at least will have the opportunity to waive his privileges so that Johnson can establish whether Traylor participated in the decision to invoke the right to counsel.[53] Only the true facts should be the basis for depriving a man of his liberty.
For the above reasons, I dissent from the majority's characterization of the facts in this case.

*978 B. The Edwards Analysis
There also are grave problems with the majority's legal analysis of the Fifth Amendment issue. When Johnson told police not to question his client, he plainly was invoking one aspect of the Fifth Amendment right against self-incrimination  the right to refuse to be interrogated without counsel being present.[54] On this question, the United States Supreme Court's case law teaches that
once a suspect asserts the right, not only must the current interrogation cease, but he may not be approached for further interrogation "until counsel has been made available to him," [Edwards,] 451 U.S., at 484-485, 101 S.Ct., at 1884-1885  which means, we have most recently held, that counsel must be present, Minnick v. Mississippi, 498 U.S. ___, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990). If the police do subsequently initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards... . The Edwards rule, moreover, is not offense-specific: once a suspect invokes the Miranda right to counsel for interrogation regarding one offense, he may not be reapproached regarding any offense unless counsel is present. Arizona v. Roberson, 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988).
McNeil v. Wisconsin, ___ U.S. ___, 111 S.Ct. 2204, 2208, 115 L.Ed.2d 158 (1991). The only exception to this rule is that situation in which the suspect voluntarily discloses information to the authorities without prompting, Minnick, 111 S.Ct. at 489, which clearly had not occurred here based on the trial court's factual findings.
In its Minnick opinion, the Court rejected the contention that the right recognized in Edwards somehow could be waived without further assistance of counsel. The Court stated:
Whatever the ambiguities of our earlier cases on this point, we now hold that when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney.
... . A single consultation with an attorney does not remove the suspect from persistent attempts by officials to persuade him to waive his rights, or from the coercive pressures that accompany custody and that may increase as custody is prolonged.
Id. at 491. The Court went on to say:
We noted in Miranda that "[e]ven preliminary advice given to the accused by his own attorney can be swiftly overcome by the secret interrogation process. Thus, the need for counsel to protect the Fifth Amendment privilege comprehends not merely a right to consult with counsel prior to questioning, but also to have counsel present during any questioning if the defendant so desires."
Id.
One might argue that the foregoing holdings should not be applied to the present case because only the Alabama authorities  not the Florida authorities  were aware that Traylor had invoked his Edwards right. However, this question was resolved to the contrary in Roberson. There, the United States Supreme Court stated:

*979 [W]e attach no significance to the fact that the officer who conducted the second interrogation did not know that respondent had made a request for counsel. In addition to the fact that Edwards focuses on the state of mind of the suspect and not of the police, custodial interrogation must be conducted pursuant to established procedures, and those procedures in turn must enable an officer who proposes to initiate an interrogation to determine whether the suspect has previously requested counsel.... Whether a contemplated reinterrogation concerns the same or a different offense, or whether the same or different law enforcement authorities are involved in the second investigation, the same need to determine whether the suspect has requested counsel exists.
Roberson, 108 S.Ct. at 2101. In other words, the burden falls on law enforcement to learn whether the Edwards right has been asserted. The failure to do so renders any subsequent interrogation impermissible, even if the Miranda rights are waived by the suspect. See id.
Significantly, the majority expressly codifies the principles of the Edwards line of cases, discussed above, within article I, section 9 of the Florida Constitution. Majority op. at 966 n. 14. With this, I have no quarrel. However, the majority's error occurs in its treatment of the role of counsel. The majority concludes that the defendant is required to personally assert the Fifth Amendment right, and that counsel cannot assert the right on the client's behalf. Majority op. at 971. In support of this conclusion, the majority cites no precedent and provides no analysis whatsoever.
Even when viewed without the aid of legal theory, the majority's conclusion in this regard is quite surprising. It is tantamount to saying that an attorney cannot speak for a client on legal issues. It effectively says that an attorney who has consulted with the client behind the opaque veil of the attorney-client privilege[55] is powerless to act upon that consultation by asserting the client's rights. This is an absurd conclusion,[56] since it is utterly contrary to the most fundamental conceptions of an attorney's role in representing a client.
Moreover, I can find absolutely no authority and no legal theory supporting the majority's conclusion in this regard. Florida law, for example, has long been settled that the acts of an attorney are imputed to the client so completely that the attorney legally is the alter ego of the client except in extreme circumstances clearly inapplicable here, such as outright fraud or a serious violation of professional ethics. In effect, the voice of the attorney is the voice of the client. Griffith v. Investment Co., 92 Fla. 781, 110 So. 271 (1926); Small v. Colonial Investment Co., 92 Fla. 503, 109 So. 433 (1926); see Abney v. Hurner, 97 Fla. 240, 121 So. 883 (1929); State ex rel. Gutierrez v. Baker, 276 So.2d 470 (Fla. 1973) (acts of attorney are binding on client). Other jurisdictions are in general agreement with this principle.[57]E.g., United States v. DiMucci, 879 F.2d 1488, 1496 (7th Cir.1989); McNeal v. Wainwright, *980 722 F.2d 674, 676-77 (11th Cir.1984); Camp v. United States, 352 F.2d 800 (5th Cir.1965).
The selfsame principle has been applied in cases involving an attorney's assertion of a client's constitutional rights. In Brewer v. Williams, 430 U.S. 387, 97 S.Ct. 1232, 1235-36, 1240-41, 51 L.Ed.2d 424 (1977), the United States Supreme Court held that the Sixth Amendment right to counsel had been violated when police interrogated a defendant after the attorney had asked the police not to do so. This message was communicated to police by the attorney after he had consulted with the client by telephone. The Court could only have found a violation of the Constitution if the attorney in fact had authority to assert the right on behalf of the client.
Also relying on the Sixth Amendment, the Fifth Circuit Court of Appeals has underscored the holding of the Brewer Court:
After counsel for a person who has been charged with and arrested for a criminal offense has directed the police not to interrogate the accused in the absence of counsel, a confession elicited from the accused by police questioning in counsel's absence is inadmissible even though the police have given him a Miranda warning.
Felder v. McCotter, 765 F.2d 1245, 1246 (5th Cir.1985), cert. denied, 475 U.S. 1111, 106 S.Ct. 1523, 89 L.Ed.2d 921 (1986). Obviously, this holding is premised on the belief that an attorney has complete authority to assert constitutional rights on behalf of the client. Accord United States v. Lilla, 534 F. Supp. 1247 (N.D.N.Y. 1982); United States v. Callabrass, 458 F. Supp. 964 (S.D.N.Y. 1978).
Other courts have extended these same principles into the Fifth Amendment context. The Texas Court of Criminal Appeals, for example, has directly recognized that an attorney can assert a Fifth Amendment right on behalf of the client in dealings with the police. Janecka v. State, 739 S.W.2d 813, 828 (Tex. Crim. App. 1987); Wilkerson v. State, 657 S.W.2d 784 (Tex. Crim. App. 1983), cert. denied, 470 U.S. 1008, 105 S.Ct. 1371, 84 L.Ed.2d 390 (1985); Phifer v. State, 651 S.W.2d 774 (Tex. Crim. App. 1983); Stone v. State, 612 S.W.2d 542 (Tex. Crim. App. 1981); Williams v. State, 566 S.W.2d 919 (Tex. Crim. App. 1978). A similar conclusion was reached by the Oregon Court of Appeals in State v. Barmon, 67 Or. App. 369, 679 P.2d 888, 892, review denied, 297 Or. 227, 683 P.2d 91 (1984), which also concluded that the attorney's statements were binding on the police under Edwards.
In a case addressing the precise issue before us today, a unanimous panel of Florida's Second District Court of Appeal held that an attorney's assertion of the Fifth Amendment right recognized in Edwards is binding on the police:
The state concedes that prior to the questioning of the defendant by Officer Price at the jail, the defendant was visited by his attorney. The attorney informed the booking officer at the jail that he represented the defendant and did not want him questioned without the attorney's presence. The defendant thus clearly invoked his right to have counsel present during custodial interrogation.
Del Duca v. State, 422 So.2d 40, 40 (Fla.2d DCA 1982) (citing Edwards). Nowhere does the majority address this holding or purport to overrule it.
I agree there are some limited exceptions to the general principle that an attorney can invoke a client's Edwards right with regard to the police. For example, the Texas Court of Criminal Appeals has held that the right cannot be invoked by an attorney who has not yet even spoken with the "client."[58]Janecka, 739 S.W.2d at *981 828. This conclusion is in harmony with the United States Supreme Court's opinion in Moran v. Burbine, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). In Moran, the Court concluded that the Fifth and Sixth Amendments are not offended if police fail to inform an attorney that a suspect will be interrogated, when the attorney had only been contacted by a relative of the suspect and never had talked with the suspect. Accord Edwards v. State, 167 Ga. App. 681, 307 S.E.2d 264 (1983).
The rules I distill from the foregoing case law are as follows:
First, an attorney acts as the voice and alter ego of the client-defendant under Florida law. E.g., Griffith. As such, the attorney has complete authority to assert a Fifth Amendment privilege (or any other constitutional right, for that matter) to police on behalf of the client.[59]Del Duca. Accord Brewer; Felder. The only prerequisite is that the attorney must have consulted with the client before this assertion is made. Moran; Janecka. Consultation is necessary because counsel cannot claim clairvoyance in knowing what the client wants, but must actively inquire as to that question after giving appropriate legal advice. By engaging in even one prior consultation, however, a conclusive presumption then arises that the attorney is speaking on behalf of the client, since it is not permissible to go behind the veil of the attorney-client privilege to refute such a presumption. § 90.502, Fla. Stat. (1985) (defining the scope of Florida's attorney-client privilege).
Second, when the attorney subsequently asserts the right recognized in Edwards on behalf of the client, the police cannot initiate further contacts with the client-suspect, even if the latter is given Miranda warnings and purports to waive the Fifth Amendment right. McNeil; Minnick; Edwards. This restriction applies to all law enforcement agents and agencies, even if they have no actual knowledge that the right has been asserted. Roberson. A very limited form of waiver then can occur only if the client-suspect initiates the contact with police and volunteers information without being interrogated. Minnick.
Third, because Fifth Amendment rights are not offense-specific, McNeil, 111 S.Ct. at 2208, they apply at least to all charges that are or may be brought against the accused during the period of incarceration while any single charge is pending. Accordingly, once the attorney asserts the Edwards right on behalf of an incarcerated client, no further police interrogation of the client can occur about any offense, *982 charged or uncharged, unless the attorney is present.
Applying these principles to the present case, I find that the procedures employed by both the Alabama and Florida authorities when they interrogated Traylor on August 22, 1980, violated the Edwards rule. Johnson by that time had been appointed counsel and thus was attorney-of-record for Traylor. The trial court specifically found that Johnson had consulted with Traylor and asserted his client's Fifth Amendment rights by instructing the police not to question his client. The record upon which the trial court relied in reaching this conclusion clearly shows that Johnson had consulted with Traylor prior to asserting these rights. Under Roberson, this instruction is imputed to the Florida authorities.
Although Traylor did not actively object to the interrogation, he also did not initiate the contact. The trial court so found when it stated "[i]t is true that the Defendant did not initiate the interview as such."[60] This finding is supported by overwhelming evidence and must be accepted as true in this review. In fact, the police took Traylor from his jail cell and drove him to the district attorney's office specifically to be questioned, and only then did the interrogation begin. Clearly, the police went to great lengths to initiate the interrogation themselves.
Moreover, Officer Grubbs  to whom Johnson previously had asserted Traylor's Fifth Amendment rights  actively participated in this interrogation and failed to tell other officers that the Edwards right had been invoked. The surreptitious nature of the interrogation was only underscored by the fact that the attorney, when he learned of the police activities, interrupted and stopped the ongoing interrogation.
Accordingly, all statements made to both the Alabama and Florida authorities during the uncounseled interrogation on August 22 were illegally obtained and were inadmissible. The district court below properly ruled that these statements should have been suppressed. However, I agree with the State's assertion that the error in admitting these statements was harmless beyond a reasonable doubt in light of the other admissible confessions, the threats against the victim, and the physical evidence. In light of the entire record, the State has shown there is no reasonable possibility that the jury's verdict would have been changed had the error not been committed.

C. Points of Agreement with the Majority
Finally, I must emphasize the reasons I am writing this separate opinion and the fact that I am dissenting only as to portions of the majority opinion. There are important aspects of the majority opinion with which I wholeheartedly agree. Indeed, I find myself in complete agreement with the statements of legal principles contained in Parts II through IV of the majority and with the bulk of Part V, at least as far as they go. I would go further than the majority in several important respects on Parts II through V, but I agree that the rights created by the Florida Constitution are at least as extensive as those recited by the majority.
I fully concur in Parts II and III of the majority opinion, and especially its statement regarding the primacy of the Florida Constitution in state courts. Majority op. at 962. Clearly, state constitutional issues must be considered first whenever fundamental rights are at stake. Far too often, both bench and bar fail even to consider the possibility that some principle of the Florida Constitution may be dispositive of the issue. This practice clearly is contrary to the two central policies upon which the doctrine of primacy rests.
First, primacy promotes judicial economy. As is obvious to all, lawyers and courts need address federal claims only if no violation is found under the Florida Constitution. *983 If the state constitution provides greater rights than the federal, then there is no need for litigants to waste further time and resources in appeals or other challenges mounted in the federal courts. Second and most importantly, primacy gives the state Constitution the respect and effect its framers manifestly intended it to have. The Florida Constitution is not a nullity to be ignored. Its words are not meaningless. When the state Constitution creates a fundamental right, that right must be respected, even if no similar right is recognized by the federal courts.
To this end, the doctrine of primacy promotes the long-standing tradition of American states interpreting their own constitutions independently. Few now remember  but it nonetheless is true  that the federal Bill of Rights was not deemed binding on the states for roughly the first 150 years of the American republic. Only starting in the middle part of this century did the federal courts gradually expand the scope of the Fourteenth Amendment to "incorporate" virtually the entire range of rights contained in the first eight amendments to the federal Constitution.
Prior to this time, the only guardians protecting individual liberty were the state constitutions and the courts that interpreted them. Without these independent efforts, nothing would have prevented an American state from establishing an official religion, prohibiting free speech, forbidding public assemblies, or authorizing medieval methods of extracting confessions from defendants. All of these evils were avoided when the people of the states, including Florida, adopted freestanding constitutional guarantees expressly forbidding such practices. Thus, the doctrine of primacy recognized by the majority is a vital and living concept whose antecedents extend back to the earliest days of Florida history.
I concur in the majority's statements in Part IV that article I, section 9 of the Florida Constitution has codified the requirement that Miranda warnings be given to suspects prior to questioning.[61] I also agree with that portion of Part IV recognizing that the Edwards rule exists as a matter of state law under article I, section 9 of the Florida Constitution. I agree that this incorporation includes both the holding of Edwards and several other cases refining Edwards' holding as to Fifth Amendment issues. See Majority op. at 966 & 966 n. 14 (citing Minnick, Roberson, and Edwards).
Moreover, the majority opinion also recognizes two other important principles. First, once the Edwards right has been asserted, the authorities may not initiate interrogation in the absence of counsel even if the suspect purports to waive the right, unless the suspect actually initiates the contact and volunteers information to the authorities.[62] Majority op. at 966 & 966 n. 14 (citing with approval Minnick, Roberson, and Edwards, supporting same conclusion). Second, the assertion of the refusal to any law enforcement agent is binding upon all other such agents  even those from other jurisdictions  whether or not these agents have actual knowledge that the right has been asserted. Id.
I concur in the remainder of Part IV of the majority, although I would go further than the majority for the reasons expressed more fully below.
With only a single exception, I also concur in Subpart V(A) of the majority opinion, as far as it goes, since I find that the right *984 to counsel is at least as extensive as that described by the majority. I would only emphasize, as the majority opinion itself suggests,[63] that another very strong interest protected by article I, section 16 is the right of individuals to interpose counsel between themselves and the state whenever they are suspected of crimes, whether charged or uncharged. Art. I, § 16, Fla. Const.
As is applicable to police procedures, I believe this right of interposition is derived not merely from article I, section 16, but is coextensive with the right-to-counsel clause in article I, section 9 of the Florida Constitution. In this context, the "rights" created by these two sections are not really separate at all.[64] Thus, by asking for the assistance of an attorney, the suspect should be presumed to be asking for assistance for all purposes in dealing with the police. By choosing assistance of counsel, suspects in effect build a doorway between themselves and the police. That doorway is the attorney; and through that doorway the police are obliged to go in all but their most perfunctory dealings with the suspect.
Several conclusions flow from this premise. I agree with the majority that, as to the offense for which the suspect initially has been detained, the right to counsel under article I, section 16 continues until the conclusion of the prosecution. Majority op. at 968. I also agree that the right to counsel under article I, section 9 continues at least for the duration of custodial detention of the suspect. Majority op. at 966. Moreover, in dealings with the police, all a defendant need do is ask for "the assistance of an attorney" or words generally to that effect, which immediately would entitle that defendant to all the rights created by article I, section 9. Majority op. at 966. The majority recognizes that no particular "magic words" are needed to invoke the right.[65]Id. In this, I concur.
I have only one real difference with the majority's analysis in Subpart V(A). I dissent from the following sentence and its accompanying citation:
Because a prime interest protected by the Counsel Clause is the right to exercise self-determination in the face of specific criminal charges, the right to counsel is charge-specific[31] and invocation of the right on one offense imposes no restrictions on police inquiry into other charges for which the right has not been invoked.
[31] Cf. McNeil v. Wisconsin, ___ U.S. ___, 111 S.Ct. 2204, 2207, 115 L.Ed.2d 158 (1991) (Sixth Amendment right is "offense-specific").
Majority op. at 968. I would hold that, in all dealings with the police, the rights created by article I, section 16 are not charge-specific throughout the same period of custodial detention, but apply to all charges *985 police begin investigating during that detention. Thus, if the right is invoked at first appearance and the suspect is under police detention at the time, then all later police interrogation must be done in the presence of counsel. I believe such a holding would best respect the policies underlying the right to counsel, including the right to interpose counsel between oneself and the police, and the right to be free from coercion when one is suspected of crime.
I fully concur in Subpart V(B) of the majority opinion and would only add that I believe article I, section 21 of the Florida Constitution independently requires the same result. Under this portion of the Declaration of Rights, all persons are guaranteed meaningful access to the courts of this state for the administration of justice. Art. I, § 21, Fla. Const. Thus, in the criminal-law context and in light of the great complexity of modern law, an indigent defendant is denied meaningful access to justice unless the services of an attorney are made available.
As noted earlier, I dissent from Part VI, since I believe the confession to the Florida murder should have been suppressed. Part VI violates the Edwards line of cases. Thus, the majority opinion also violates its own holding that the Edwards line of cases has been codified within article I, section 9 of the state Constitution. I find that the majority errs both factually and legally when it finds "[c]ompetent substantial evidence support[ing] the trial court's finding that Traylor never invoked his privilege against self-incrimination." Majority op. at 971. Accordingly, I dissent from this holding and its related analysis. Majority op. at 971-972. I concur, however, in the conclusion that the confession to the Alabama offense was inadmissible.
Despite my objections to the majority's analysis, I concur in the result reached by the majority, since I have found the errors harmless beyond a reasonable doubt.
BARKETT, J., concurs.
NOTES
[1] The state proposed to introduce the confession to the Alabama crime as "similar fact" evidence in the trial on the Florida offense.
[2] As of 1986, courts in the following states had construed the self-incrimination provisions of their state constitutions independently of the federal Court's Fifth Amendment holdings: Alaska, California, Georgia, Hawaii, Louisiana, Massachusetts, Michigan, New Hampshire, Pennsylvania, Vermont, and Wyoming. See Scott v. State, 519 P.2d 774 (Alaska 1974); In re Misener, 38 Cal.3d 543, 213 Cal. Rptr. 569, 698 P.2d 637 (1985); State v. Armstead, 152 Ga. App. 56, 262 S.E.2d 233 (1979); State v. Miyasaki, 62 Haw. 269, 614 P.2d 915 (1980); State in re Dino, 359 So.2d 586 (La.), cert. denied, 439 U.S. 1047, 99 S.Ct. 722, 58 L.Ed.2d 706 (1978); Attorney Gen. v. Colleton, 387 Mass. 790, 444 N.E.2d 915 (1982); People v. Conte, 421 Mich. 704, 365 N.W.2d 648 (1984); State v. Benoit, 126 N.H. 6, 490 A.2d 295 (1985); Commonwealth v. Bussey, 486 Pa. 221, 404 A.2d 1309 (1979); State v. Badger, 141 Vt. 430, 450 A.2d 336 (1982); Westmark v. State, 693 P.2d 220 (Wyo. 1984). Mary A. Crossley, Note, Miranda and the State Constitution: State Courts Take a Stand, 39 Vand. L.Rev. 1693, 1717-18 n. 181 (1986).
[3] See also Oregon v. Hass, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975); Cooper v. California, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967). See generally State v. Hunt, 91 N.J. 338, 450 A.2d 952 (1982).
[4] See William J. Brennan, Introduction: Chief Justice Hughes and Justice Mountain, 10 Seton Hall L.Rev. xii (1979) ("[I]t is the state courts at all levels, not the federal courts, that finally determine the overwhelming number of the vital issues of life, liberty and property that trouble countless human beings of this Nation every year.").
[5] Under the federalist principles expressed above, where a proposed constitutional revision results in the loss or restriction of an independent fundamental state right, this loss must be made known to each participating voter at the time of the general election. Cf. People Against Tax Revenue Mismanagement v. County of Leon, 583 So.2d 1373, 1376 (Fla. 1991) ("This is especially true if the ballot language gives the appearance of creating new rights or protections, when the actual effect is to reduce or eliminate rights or protections already in existence.").
[6] See also Metzger v. State, 18 Fla. 481, 488 (1881).
[7] See also Green v. State, 40 Fla. 474, 476, 24 So. 537, 538 (1898).
[8] See, e.g., Daniels v. State, 57 Fla. 1, 2, 48 So. 747, 748 (1909).
[9] See also Nickels v. State, 90 Fla. 659, 703, 106 So. 479, 495 (1925) (Terrell, J., concurring).
[10] See Reddish v. State, 167 So.2d 858, 863 (Fla. 1964); Williams v. State, 156 Fla. 300, 303, 22 So.2d 821, 823 (1945); Flowers v. State, 152 Fla. 649, 659, 12 So.2d 772, 778, cert. denied, 320 U.S. 767, 64 S.Ct. 49, 88 L.Ed. 458 (1943).
[11] See Jones v. Stoutenburgh, 91 So.2d 299, 303 (Fla. 1956); State ex rel. Byer v. Willard, 54 So.2d 179, 181 (Fla. 1951).
[12] In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the federal Court established procedural safeguards similar to those defined above in order to ensure the voluntariness of statements rendered during custodial interrogation. In subsequent decisions, the Court expanded Miranda's scope. See, e.g., Minnick v. Mississippi, ___ U.S. ___, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990); Arizona v. Roberson, 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988); Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

In other areas, the Court limited Miranda's scope. See, e.g., Illinois v. Perkins, 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990); Duckworth v. Eagan, 492 U.S. 195, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989); Colorado v. Spring, 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987); Colorado v. Connelly, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); Moran v. Burbine, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986); Oregon v. Elstad, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985); New York v. Quarles, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984); Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975); Michigan v. Tucker, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974); Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).
[13] This means that the suspect has the right to consult with a lawyer before being interrogated and to have the lawyer present during interrogation.
[14] Once the right to counsel has been invoked, any subsequent waiver during a police-initiated encounter in the absence of counsel during the same period of custody is invalid, whether or not the accused has consulted with counsel earlier. Cf. Minnick; Roberson; Edwards (comparable rule under federal law).
[15] A written waiver will dispel a major criticism of Miranda, i.e., that it did "nothing whatsoever to mitigate the pitfalls of the swearing contest" between the defendant and the policeman as to the content of warnings, or whether warnings were given at all. See Stephen J. Schulhofer, Confessions and the Court, 79 Mich.L.Rev. 865, 882 (1981). Written waivers are in fact common in many cases. The present case involves one.
[16] A person is in custody for Section 9 purposes if a reasonable person placed in the same position would believe that his or her freedom of action was curtailed to a degree associated with actual arrest. Cf. Berkemer v. McCarty, 468 U.S. 420, 440-42, 104 S.Ct. 3138, 3150-51, 82 L.Ed.2d 317 (1984).
[17] Interrogation takes place for Section 9 purposes when a person is subjected to express questions, or other words or actions, by a state agent, that a reasonable person would conclude are designed to lead to an incriminating response. Cf. Rhode Island v. Innis, 446 U.S. 291, 300-01, 100 S.Ct. 1682, 1689-90, 64 L.Ed.2d 297 (1980).
[18] See, e.g., § 3969, Gen.Stats. 1906, F.C.L. (1914); § 1347, Gen.Stats. 1906, F.C.L. (1914).
[19] See § 454.18, Fla. Stat. (1989).
[20] See Fla.R.Crim.P. 3.111, 3.130, 3.160.
[21] See Faretta v. California, 422 U.S. 806, 833-34, 95 S.Ct. 2525, 2540-41, 45 L.Ed.2d 562 (1975).
[22] Id. at 813 n. 10, 95 S.Ct. at 2530 n. 10.
[23] This right necessarily entails two corresponding rights  the right to conduct one's own defense and the right to assistance of counsel.
[24] Cf. United States v. Wade, 388 U.S. 218, 237, 87 S.Ct. 1926, 1937, 18 L.Ed.2d 1149 (1967) (Sixth Amendment right to counsel applies to each "critical stage" of the prosecution).
[25] Section 16 also protects the right of the individual to a fair trial.
[26] Cf. Kirby v. Illinois, 406 U.S. 682, 689-90, 92 S.Ct. 1877, 1882-83, 32 L.Ed.2d 411 (1972) (prosecution begins under Sixth Amendment with initiation of "judicial criminal proceedings").
[27] See infra notes 37-43 and accompanying text.
[28] Cf. Brewer v. Williams, 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977) (under Sixth Amendment, "courts indulge in every reasonable presumption against waiver"). See generally Fla.R.Crim.P. 3.111(d).
[29] See Fla.R.Crim.P. 3.111(d)(5).
[30] Once the right has attached and been invoked, any subsequent waiver during a police-initiated confrontation in the absence of counsel is per se invalid. Cf. Michigan v. Jackson, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986) (comparable rule under Sixth Amendment).
[31] Cf. McNeil v. Wisconsin, ___ U.S. ___, 111 S.Ct. 2204, 2207, 115 L.Ed.2d 158 (1991) (Sixth Amendment right is "offense-specific").
[32] Cutts v. State, 54 Fla. 21, 22, 45 So. 491, 491 (1907).
[33] See, e.g., Watson v. State, 142 Fla. 218, 223, 194 So. 640, 642 (1940).
[34] See, e.g., §§ 27.51, .52, Fla. Stat. (1989).
[35] See, e.g., Fla.R.Crim.P. 3.111, 3.130, 3.160.
[36] See, e.g., Shriners Hospitals v. Zrillic, 563 So.2d 64 (Fla. 1990); De Ayala v. Florida Farm Bureau Casualty Ins. Co., 543 So.2d 204 (Fla. 1989); Palm Harbor Special Fire Control Dist. v. Kelly, 516 So.2d 249 (Fla. 1987); Storer Cable T.V. v. Summerwinds Apartments Assocs., 493 So.2d 417 (Fla. 1986); Vildibill v. Johnson, 492 So.2d 1047 (Fla. 1986).
[37] See also Fla.R.Crim.P. 3.140.
[38] As a general rule, assignment of counsel is feasible by the time of booking. See Fla. R.Crim.P. 3.111(c).
[39] See also Fla.R.Crim.P. 3.130.
[40] See Committee Note to Fla.R.Crim.P. 3.111.
[41] The commentary following the American Bar Association (ABA) Standard provides in part:

Perhaps most important, unless the impecunious accused is provided counsel at the earliest possible time, an invidious discrimination is present between the poor defendant and the defendant of financial means: The latter is able to afford counsel and frequently acquires legal representation well before formal commencement of adversary proceedings. This standard seeks to provide for the eligible accused similar representation opportunities.
1 Standards for Criminal Justice § 5-5.1 (Am. Bar Ass'n 1980).
[42] The committee note following this rule states that "[t]here was considerable discussion within the committee concerning the time when counsel should be appointed... . The commentary in the ABA Standard under 5.1a, b, convinced the committee to the language here contained." Committee Note to Fla.R.Crim.P. 3.111(a). The commentary to the ABA Standard provides in part:

This standard, however, extends beyond the Supreme Court's decisions, for it applies to situations that have not been held to be "critical stages" within the meaning of the sixth amendment. Thus, the standard recommends that counsel be provided "as soon as feasible after custody begins," assuming that this event occurs, as it usually does, prior to the defendant's appearance before a judicial officer or the filing of formal charges.
Effective representation of the accused requires that counsel be provided at the earliest possible time. Often there are witnesses who must be interviewed promptly by the defense lest their memories of critical events fade or the witnesses become difficult to locate. Where the accused is incarcerated, defense counsel must begin immediately to marshal facts in support of the defendant's pretrial release from custody.
1 Standards for Criminal Justice § 5-5.1 (Am. Bar Ass'n 1980).
[43] Cf. Ponticelli v. State, 593 So.2d 483 (Fla. 1991) (right to counsel under federal Sixth Amendment had not attached where judicial criminal proceedings had not begun); Kight v. State, 512 So.2d 922 (Fla. 1987) (Sixth Amendment right had not attached where formal charges had not been filed), cert. denied, 485 U.S. 929, 108 S.Ct. 1100, 99 L.Ed.2d 262 (1988); Keen v. State, 504 So.2d 396 (Fla. 1987) (Sixth Amendment right had not attached where formal charges had not been filed); Anderson v. State, 420 So.2d 574 (Fla. 1982) (Sixth Amendment right had attached where defendant had been indicted and would have attended first appearance if he had been present in Florida); Peoples v. State, 576 So.2d 783 (Fla. 5th DCA 1991) (state and federal right attaches on indictment or information); McHaney v. State, 513 So.2d 252 (Fla. 2nd DCA 1987) (unspecified right to counsel had not attached where line-up was held prior to first appearance); Traylor v. State, 498 So.2d 1297 (Fla. 1st DCA 1986) (federal right had attached where information had been issued); Sobczak v. State, 462 So.2d 1172 (Fla. 4th DCA 1984) (state right attaches as early as first appearance); State v. Douse, 448 So.2d 1184 (Fla. 4th DCA 1984) (state right attaches as early as first appearance.)
[44] Johnson had just received the letter of appointment the day before, August 19.
[45] Defense counsel at the suppression hearing prevented Johnson from being questioned concerning any statement made by Traylor to Johnson, claiming attorney-client privilege.
[46] Because the Section 16 right to counsel is charge-specific, the fact that Traylor had invoked his right to counsel on the Alabama offense is irrelevant to the Florida charge.
[47] Cf. Patterson v. Illinois, 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988) (comparable result under similar facts under Sixth Amendment).
[48] We note that the extent of the required inquiry into the defendant's understanding of the consequences of waiver of the Section 16 right to counsel will vary depending on the stage of the prosecution. For instance, an inquiry that suffices for postcharge questioning need not be as elaborate as the formal inquiry that is required for waiver of counsel at trial. Cf. id. (comparable rule under Sixth Amendment).
[49] We conclude that the same result would obtain under federal law. See McNeil v. Wisconsin, ___ U.S. ___, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991); Patterson; Michigan v. Jackson, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986); Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972); Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); Brown v. Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936).
[50] The district court found admission of the confessions harmless "in the face of other overwhelming evidence of guilt." Traylor v. State, 498 So.2d 1297, 1301 (Fla. 1st DCA 1986).
[51] The trial court so found in its order on the motion to suppress.
[52] I am doubly surprised at this assumption. After erroneously concluding that the Fifth Amendment right cannot be asserted through counsel, majority op. at 971, there is no need for the majority to worry itself with what transpired between Johnson and Traylor. The only remaining issue would be whether Traylor personally asserted his Fifth Amendment right, which he clearly did not do at the relevant times. The fact that the majority concerns itself with this issue can only mean that some importance is being attached to Johnson's authority to speak with police on behalf of Traylor. In essence, the majority is adopting an alternative theory that Johnson was acting beyond the scope of his authority as an attorney, and his statements to police therefore had no legal effect. I dissent from this view.
[53] Even then, I have very grave doubts that the state lawfully can require Traylor to make this Hobson's choice. See U.S. Const. amend. V; art. I, § 9, Fla. Const.; § 90.502, Fla. Stat. (1985).
[54] This fact distinguishes the present matter from a line of cases from the Fifth and Eleventh Circuits, where there was no assertion of the Edwards right either by counsel or the accused. Tinsley v. Purvis, 731 F.2d 791 (11th Cir.1984); United States v. Brown, 569 F.2d 236 (5th Cir.1978); United States v. Vasquez, 476 F.2d 730 (5th Cir.), cert. denied, 414 U.S. 836, 94 S.Ct. 181, 38 L.Ed.2d 72 (1973). In each of these cases, the accused was interrogated without the assistance of counsel after waiving all relevant rights. The courts uniformly concluded that this procedure did not violate the Fifth and Sixth Amendments, even if counsel previously had been appointed for the accused. In other words, either the attorney or the client must assert the right against uncounseled interrogation before the protections afforded by Edwards will attach. Here, that right in fact was asserted by counsel.
[55] See § 90.502, Fla. Stat. (1985).
[56] No one would seriously contend, for example, that an attorney is powerless to invoke the defendant's Fifth Amendment right to remain silent at a criminal trial. U.S. Const., amend. V. I see no relevant distinction between asserting the right in this context and asserting it to the police prior to an interrogation.
[57] Simultaneously, the attorney carries an absolute obligation to represent the interests and protect the rights of the client. Gay v. Heller, 252 F.2d 313, 316 (5th Cir.1958). Obviously, this duty is of special weight in the criminal-law context, where a dereliction by the attorney could result in the client losing life or liberty. The gravity of this obligation was directly recognized in Miranda v. Arizona, 384 U.S. 436, 480-81, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), where the Court stated:

An attorney may advise his client not to talk to police until he has had an opportunity to investigate the case, or he may wish to be present with his client during any police questioning. In doing so an attorney is merely exercising the good professional judgment he has been taught. This is not cause for considering the attorney a menace to law enforcement. He is merely carrying out what he is sworn to do under his oath  to protect to the extent of his ability the rights of his client.
(Emphasis added.)
[58] I recognize that the Texas court sometimes has suggested that the police must agree not to interrogate the accused in the absence of counsel before the Fifth Amendment right will attach. However, the Janecka court clarified this misimpression in the following terms:

Our opinions in the past have sometimes focused on the agreement of police officers not to question a suspect in his attorney's absence. If an accused, or an attorney speaking for the accused, has stated a desire to talk to the police only in the presence of counsel, that request must be honored whether or not police officers agree.
Janecka v. State, 739 S.W.2d 813, 828 n. 6 (Tex. Crim. App. 1987). Thus, a police agreement not to interrogate in the absence of counsel is relevant evidence, but the lack of such an agreement does not excuse a subsequent failure to honor counsel's instructions.
[59] The only case I have found making a contrary assertion  State v. Beck, 687 S.W.2d 155 (Mo. 1985), cert. denied, 476 U.S. 1140, 106 S.Ct. 2245, 90 L.Ed.2d 692 (1986)  is singularly unpersuasive. First, the case is factually distinguishable. In Beck, the Missouri Supreme Court confronted a case in which an attorney also had not spoken with the client, much like the facts in Moran. Second and more significantly, the Beck court stated in dictum that an attorney can never assert the client's Fifth Amendment rights, but the court made this statement based on an obvious and blatant misreading of United States Supreme Court precedent:

Appellant's constitutional privilege against self-incrimination is a personal one and is a right that cannot be exercised by third parties. United States v. [Nobles], 422 U.S. 225, 233, 95 S.Ct. 2160, 2167, 45 L.Ed.2d 141 (1975).
Id. at 158 n. 7. In actuality, the Nobles Court had set forth a wholly unrelated point of law:
We thus conclude that the Fifth Amendment privilege against compulsory self-incrimination, being personal to the defendant, does not extend to the testimony or statements of third parties called as witnesses at trial.
Nobles, 422 U.S. at 234, 95 S.Ct. at 2168 (emphasis added). This is a vastly different matter than the issue at hand. An attorney clearly acts on behalf of a client and can assert that client's personal rights, whereas a third-party witness in a proceeding has no such relationship with the client and cannot assert that client's rights. I thus find the dictum in Beck unconvincing and unnecessary for the holding the court reached. The Beck court could have resolved the issue simply on the fact that counsel had not yet spoken with the accused, as did the Court in Moran v. Burbine, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).
[60] The trial court went on to dismiss this fact in light of the totality of the circumstances. For the reasons set forth above, I do not agree with this assessment, because it is erroneous as a matter of law. The majority opinion thus errs when it approves the judge's legal conclusion on grounds they are supported by competent substantial evidence. Majority op. at 971. As recited by the trial court, the facts and statements of law establish a plain constitutional error.
[61] Article I, section 9 also embodies an exclusionary rule, as the majority notes. Majority op. at 966. I fully concur in this conclusion.
[62] Obviously, the contact initiated by the suspect must be more than a perfunctory or mundane interaction. The authorities cannot use a simple "hello" or other routine contact as an excuse to interrogate the suspect once the right is asserted. Rather, the suspect must volunteer information to the authorities without being asked to do so. Thus, as soon as any police interrogation commences, the information obtained thereafter would be inadmissible whether or not the suspect is regarded as making some sort of initial contact. The rule is simple: Once the right is asserted, the police may not interrogate in the absence of counsel. Period. Whatever the suspect wishes to give the authorities without prompting is admissible evidence, but all information elicited through any interrogation by those authorities must be suppressed. Art. I, § 9, Fla. Const.
[63] Majority op. at 968, n. 23.
[64] Indeed, the fact that these "rights" have been blurred together in both a theoretical and practical sense is only emphasized by the majority's holding that article I, section 16 sometimes can attach almost immediately after a suspect is detained, thereby implicating police conduct. Majority op. at 968, 971. In an earlier and more purist sense, the traditional Fifth Amendment right applied to police activities while the Sixth Amendment right applied to courtroom activities. Although the case law now clearly establishes that some police activities also implicate the Sixth Amendment, the federal courts nevertheless have continued to analyze cases as though the antiquated distinction still exists. The majority parrots this trend in holding that article I, section 16 is charge-specific. To the extent that article I, section 16 applies to police conduct, I see no reason why it should not be analyzed precisely the same way as article I, section 9. The law should not produce complexity where none is needed to achieve justice and fairness. Police conduct is police conduct, and should be measured by the same yardstick when that conduct impacts upon the right to counsel.
[65] The majority states:

If the suspect indicates in any manner that he or she wants the help of a lawyer, interrogation must not begin until a lawyer has been appointed and is present, or, if it has already begun, must immediately stop until a lawyer is present. Once a suspect has requested the help of a lawyer, no state agent can reinitiate interrogation on any offense throughout the period of custody unless the lawyer is present, although the suspect is free to volunteer a statement to police on his or her own initiative at any time on any subject in the absence of counsel.
Majority op. at 965-966 (emphasis added; footnote omitted).